# **EXHIBIT C**

STATE OF NORTH CAROLINA

WAKE COUNTY

BEFORE THE
DISCIPLINARY HEARING COMMISSION
OF THE
NORTH CAROLINA STATE BAR
20 DHC 17

THE NORTH CAROLINA STATE BAR,

Plaintiff

v.

DANIEL S. RUFTY, Attorney,

Defendant

CONSENT ORDER
OF
DISCIPLINE

This matter came before a hearing panel of the Disciplinary Hearing Commission composed of Richard V. Bennett, Chair, Margit Monaco Hicks, and Heath R. Jenkins. Joshua T. Walthall and Savannah B. Perry represented the Plaintiff, the North Carolina State Bar. Defendant, Daniel S. Rufty, was represented by Dudley A. Witt and David Freedman. Defendant waives a formal hearing in this matter. The parties stipulate and agree to the findings of fact and conclusions of law recited in this consent order. The parties consent to the discipline imposed by this order. By consenting to the entry of this order, Defendant knowingly, freely, and voluntarily waives his right to appeal this consent order or to challenge in any way the sufficiency of the findings.

Based on the foregoing and on the consent of the parties, the Hearing Panel hereby enters by clear, cogent, and convincing evidence the following:

## FINDINGS OF FACT

1. Plaintiff, the North Carolina State Bar ("State Bar"), is a body duly organized under the laws of North Carolina and is the proper party to bring this proceeding under the authority granted it in Chapter 84 of the General Statutes of North Carolina, and the Rules and Regulations of the North Carolina State Bar (Chapter 1 of Title 27 of the North Carolina Administrative Code).

2. Defendant, Daniel S. Rufty ("Rufty" or "Defendant"), was admitted to the North Carolina State Bar in 2017, and is, and was at all times referred to herein, an attorney at law licensed to practice in North Carolina, subject to the laws of the State of North Carolina, the Rules and Regulations of the North Carolina State Bar, and the Rules of Professional Conduct.

3. During the relevant period referred to herein, Defendant was actively engaged in the practice of law in Charlotte, Mecklenburg County, North Carolina.

### DEBT ADJUSTING

4. In North Carolina, debt adjusting means "entering into or making a contract, express or implied, with a particular debtor whereby the debtor agrees to pay a certain amount of

money periodically to the person engaged in the debt adjusting business and that person, for consideration, agrees to distribute, or distributes the same among certain specified creditors in accordance with a plan agreed upon. Debt adjusting includes the business or practice of any person who holds himself out as acting or offering or attempting to act for consideration as an intermediary between a debtor and his creditors for the purpose of settling, compounding, or in any way altering the terms of payment of any debt of a debtor, and to that end receives money or other property from the debtor, or on behalf of the debtor, for the payment to, or distribution among, the creditors of the debtor. Debt adjusting also includes the business or practice of debt settlement or foreclosure assistance whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's creditors for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor, whether or not the person distributes the debtor's funds or property among the creditors, and receives a fee or other consideration for reducing, settling, or altering the terms of the payment of the debt in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full." N.C. Gen. Stat. § 14-423.

5.     There is an exemption to the prohibition on debt adjusting that allows attorneys licensed to practice law in North Carolina to negotiate the resolution of debts on behalf of consumers, provided the attorneys are not employed by a debt adjuster. N.C. Gen. Stat. § 14-426(6).

6.     Jason Blust ("Blust") is an Illinois attorney who has started or helped start various law firms ("Blust Law Firms") in multiple states with the goal of convincing debtors struggling to pay their bills to hire one of the Blust Law Firms to negotiate reduced pay off amounts with the debtors' creditors.

7.     The Blust Law Firms are engaged in the unauthorized practice of law and debt adjusting in multiple states.

8.     Since the Blust Law Firms were all established by Blust, they largely work with the same entities and individuals: Jason Blust, Kelly Seibert, Lauren Montanile, Strategic Financial Solutions, Global Client Solutions, Lit Def Strategies, Tom Rogus, Patrick Wilczak, and Ryan Sasson, among others.

9.     Carolina Legal Services ("CLS") was one of the Blust Law Firms.

10.     Jason Blust, Kelly Seibert, Lauren Montanile, Strategic Financial Solutions, Global Client Solutions, "Lit Def Strategies," Tom Rogus, Patrick Wilczak, and Ryan Sasson all provided services to CLS or CLS clients at Blust's direction and with Defendant's knowledge.

11.     Blust started CLS, decided how CLS would operate, hired its North Carolina attorney members, and established CLS's relationships with Kelly Seibert, Lauren Montanile, Strategic Financial Solutions, Global Client Solutions, "Lit Def Strategies," Tom Rogus, Patrick Wilczak, and Ryan Sasson, among others.

12.     Blust hired Defendant to provide legal services to clients of CLS in 2018, the same year Defendant graduated from Charlotte School of Law.

13.     At the time Blust hired Defendant, Defendant had limited experience in the practice of law.

14.     While Blust arranged for Defendant to be the majority owner of CLS in name only, Blust arranged for 97% of the profits of CLS to be distributed to Blust and Kelly Seibert, another out-of-state attorney, as "consultant fees."

15.     Blust was in charge of the operations of CLS and regularly told Defendant what to do.

16.     Thus, Defendant was working at the direction of Blust and, accordingly, was engaged in the practice of debt adjusting while employed by a debt adjuster.

UNSUPERVISED NONLAWYERS PROVIDING LEGAL SERVICES

17.     The CLS website indicated: "Carolina Legal Services practices under a trade name and therefore in states where required, utilizes the services of and identifies the duly licensed lawyers in those states. We are a debt relief agency. We help people file for bankruptcy relief under the Bankruptcy Code."

18.     CLS advertised that it was able to provide legal services to North Carolina residents.

19.     CLS sent fliers in the mail regarding CLS and the legal services CLS provided and offered to provide to North Carolina residents.

20.     In its advertising and marketing communications, CLS specifically targeted North Carolina consumers who were in debt with one or more creditors.

21.     CLS held out in its advertising to North Carolina consumers that it was able to help them negotiate with their creditors reduced pay-off amounts for their debts.

22.     North Carolina consumers who responded to CLS's advertising through the CLS website or via the CLS toll-free telephone line discussed their debt and legal issues with nonlawyers employed by Strategic Financial Solutions and located in offices in New York.

23.     Blust, Ryan Sasson, and others at Strategic Financial Solutions were in charge of the nonlawyers at Strategic Financial Solutions in New York and regularly told them what to do and how to handle cases.

24.     The nonlawyers at Strategic Financial Solutions enrolled North Carolina consumers with CLS, to be represented by Defendant, without Defendant's involvement.

25. At the time of enrollment, and before Defendant was involved in the representation, the nonlawyers at Strategic Financial Solutions advised the North Carolina consumers to stop paying their creditors.

26. By advising Defendant's CLS clients to stop paying their creditors, the nonlawyers at Strategic Financial Solutions provided the clients with legal advice.

27. After North Carolina consumers enrolled in the CLS program and became Defendant's CLS clients, the nonlawyers at Strategic Financial Solutions in New York assigned a local nonlawyer notary to go to the clients' homes, alone and unsupervised by Defendant or any other lawyer, to walk the clients through the process of signing contracts with CLS and Global Client Solutions, LLC and notarize the contracts.

28. The nonlawyer notaries also helped the clients execute an agreement that allowed CLS to automatically draft payments from the clients' funds into CLS's accounts.

29. During these meetings in the clients' homes, the nonlawyer notaries answered the clients' questions about the legal services CLS would provide.

30. Defendant did not hire these nonlawyer notaries.

31. Defendant did not determine how these nonlawyer notaries would be paid.

32. These nonlawyer notaries did not report to Defendant.

33. Defendant never spoke with nor met many of these nonlawyer notaries.

34. Once the clients enrolled in the CLS program, the nonlawyers employed by Strategic Financial Solutions in New York answered the clients' questions throughout the clients' relationship with CLS.

35. These nonlawyers served as Defendant's assistants during his representation of CLS clients.

36. Defendant did not hire these nonlawyers.

37. Defendant did not determine how these nonlawyers would be paid.

38. These nonlawyers did not report to Defendant.

39. Defendant never spoke with nor met many of these nonlawyers.

40. Defendant was not a party to the telephone calls these nonlawyers had with his clients.

41.     Defendant did not review many of the communications these nonlawyers had with his clients or with others on behalf of his clients.

42.     These nonlawyers worked for numerous Blust Law Firms.

43.     These nonlawyers answered questions posed by Defendant's CLS clients throughout CLS's representation of the clients, with no involvement of Defendant, even when his CLS clients specifically asked to speak with a lawyer.

44.     Defendant did not adequately supervise these nonlawyers when they answered his CLS clients' questions about their cases, debts, or legal situations.

45.     These nonlawyers provided legal advice to Defendant's CLS clients about how to handle their legal situations, when and how to file pleadings in some cases, and when and to what extent to stop paying their bills.

46.     Defendant did not adequately supervise his nonlawyer assistants when they provided legal advice to his CLS clients.

47.     Defendant permitted his nonlawyer assistants to provide such legal advice to his CLS clients.

48.     These nonlawyers negotiated, on behalf of most of his CLS clients, the resolution of debts that were subject to then-pending litigation.

49.     Defendant did not adequately supervise his nonlawyer assistants when they negotiated the resolution of debts that were subject to then-pending litigation.

50.     Defendant permitted these nonlawyers to negotiate the resolution of his CLS clients' litigation, which is a legal service in North Carolina.

MISREPRESENTATIONS TO CLIENTS

51.     At Blust's direction and with Defendant's knowledge, Defendant's nonlawyer assistants and, on occasion, Defendant himself claimed to his CLS clients that a lawyer would always be available to answer the clients' questions.

52.     However, a lawyer was not always available to answer the clients' questions; in fact, lawyers were rarely available to speak with clients of CLS.

53.     The statements made by these nonlawyer assistants at Blust's direction and with Defendant's knowledge and those made by Defendant himself to North Carolina consumers that a lawyer would always be available to answer client questions were false.

54.     At Blust's direction and with Defendant's knowledge, Defendant's nonlawyer assistants and, on occasion, Defendant himself claimed to clients that all legal services provided by the firm would be provided by licensed attorneys.

55.     However, the legal services provided by the firm were often not provided by licensed attorneys.

56.     The statements made by these nonlawyer assistants at Blust's direction and with Defendant's knowledge and those made by Defendant himself to North Carolina consumers that lawyers would be and were providing all of the legal services to the clients were false.

57.     At Blust's direction and with Defendant's knowledge, Defendant's nonlawyer assistants and, on occasion, Defendant himself claimed to clients that attorneys at CLS would negotiate the resolution of the clients' debts with various creditors.

58.     However, nonlawyers at CLS conducted most of the negotiations, including negotiations of the resolution of debts that were the subject of then-pending litigation in North Carolina.

59.     The statements made by these nonlawyer assistants at Blust's direction and with Defendant's knowledge and those made by Defendant himself to North Carolina consumers that lawyers would be and were negotiating the clients' debts on behalf of the clients were false.

ENTRUSTED FUNDS

60.     In order to enroll in the CLS program, all clients were required to establish automatically drafted payments into an account with Global Client Solutions, LLC, an online banking institution.

61.     Global Client Solutions advertises itself as an "independent, third-party payment processor for debt settlement companies and their consumers."

62.     Global Client Solutions specializes in holding debt-settlement accounts wherein consumers' funds are automatically deposited each month, a portion is set aside for the settlement of debts, and a portion is set aside as a fee to the debt-settlement company.

63.     Nonlawyers helped Defendant's CLS clients set up these accounts with Global Client Solutions before Defendant was involved in the representation and without Defendant's supervision.

64.     Nonlawyers determined the monthly payment amounts drafted into the clients' Global Client Solutions accounts before Defendant was involved in the representation and without Defendant's supervision.

65.     After the clients' funds were drafted into the clients' Global Client Solutions accounts, CLS would regularly draft funds from those client accounts into CLS bank accounts,

none of which were trust accounts and none of which were "eligible banks" pursuant to 27 N.C.A.C. 1D, § .1316(b).

66. With Defendant's knowledge and at Blust's direction and under Blust's control, the clients' funds that had been deposited into the CLS bank accounts were then disbursed to pay (a) Defendant, (b) the nonlawyers at Strategic Financial Solutions, (c) the nonlawyers at Lit Def Strategies, (d) filing fees on behalf of CLS clients, and (e) Blust's own consulting fees, among others.

67. With Defendant's knowledge and consent and at Blust's direction, CLS paid at least some of the funds drafted from clients' Global Clients Solutions accounts to the nonlawyers at Strategic Financial Solutions and the nonlawyers at Lit Def Strategies for providing legal services to Defendant's CLS clients.

68. With Defendant's knowledge and consent and at Blust's direction, at least some of the funds there were kept in the CLS bank accounts were later paid to courts in North Carolina for filing fees on behalf of the clients.

69. Thus, a portion of the funds Defendant's CLS clients paid to CLS were entrusted funds.

70. Defendant failed to deposit or maintain these entrusted funds in a trust account.

71. Defendant did not supervise the handling of any of the entrusted funds paid by his clients to CLS.

72. Defendant did not maintain any of the entrusted funds paid by his clients to CLS in accordance with the requirements of Rule of Professional Conduct 1.15 *et. seq.*

### LIMITING HIS CLIENTS' RIGHT TO DISCHARGE HIM

73. Some of Defendant's CLS clients paid money to CLS for legal services and wanted to quit the program or fire CLS before CLS provided any legal services but were told by nonlawyers at CLS that if they did quit, none of the fees they had paid theretofore would be refunded.

74. Some of Defendant's CLS clients paid money to CLS for legal services but quit the program or fired CLS prior to receiving any legal services from CLS or Defendant but did not receive any refund of the entrusted funds they had paid to CLS, notwithstanding the fact that the clients had not received any legal services from CLS.

### LACK OF COMMUNICATION

75. Defendant rarely spoke with many of his CLS clients and failed to keep them updated about the status of their cases.

76. Defendant failed to speak with many of his CLS clients to determine the goals of the representation.

77. Many of Defendant's CLS clients regularly called the law firm's number, which was answered by nonlawyers employed by Strategic Financial Solutions in New York who were not supervised by Defendant, and asked the nonlawyers at CLS to put them in touch with their lawyer, but the nonlawyers at CLS refused to put these clients in touch with Defendant.

78. At least some of Defendant's CLS clients had never heard of or spoken with Defendant.

79. Many of Defendant's CLS clients did not have Defendant's contact information.

80. When Defendant's CLS clients were sued by creditors for failure to pay their debts, it was Defendant's professional obligation to provide legal representation for those clients in North Carolina courts, including filing responsive pleadings and appearing in court on their behalf.

81. However, Defendant routinely failed to communicate with his CLS clients about their ongoing litigation, their goals regarding the litigation, and how the clients wanted to proceed.

82. Due to Defendant's total abdication of his responsibility to communicate with his CLS clients, many clients learned for the first time about Defendant's failure to file responsive pleadings or appear in court on their behalf when they received default judgments reflecting that no one had answered the complaint or appeared in court on their behalf.

UNMERITORIOUS CLAIMS AND LACK OF DILIGENCE

83. On the occasions when Defendant did file responsive pleadings on behalf of his clients, he included claims and assertions in the pleadings that had no basis in law or fact.

84. Defendant was alerted to the baselessness of these claims and assertions on more than one occasion but nonetheless continued to include them in pleadings.

85. Defendant failed to appear in court several times when some of his CLS clients' cases were calendared for hearing.

86. Defendant failed to appear in arbitrations when some of his CLS clients' cases were scheduled for arbitration.

FALSE STATEMENTS TO GRIEVANCE COMMITTEE

87. The Grievance Committee of the State Bar sent Defendant a Letter of Notice and Substance of Grievance, pursuant to 27 N.C.A.C. 1B, § .0107(2), informing Defendant of the grievance allegations against him and requiring his response to the allegations.

88.     Defendant responded to the Letter of Notice in a signed writing on 13 January 2020.

89.     In his signed response to the Letter of Notice, Defendant represented that he was supervising the nonlawyers assisting him at CLS.

90.     Defendant's representation to the Grievance Committee that he was supervising the nonlawyers assisting him at CLS was materially false.

91.     In his signed response to the Letter of Notice, Defendant represented that he was always available to his CLS clients to answer questions: "The Firm's North Carolina attorney-members are available to provide legal advice to North Carolina clients or answer questions they may have at all times."

92.     Defendant's representation to the Grievance Committee that he was always available to his CLS clients to answer questions was materially false.

93.     In his signed response to the Letter of Notice, Defendant represented that his CLS clients' payments for future legal services and future filing fees were not entrusted funds.

94.     Defendant's representation to the Grievance Committee that his CLS clients' payments for future legal services and future filing fees were not entrusted funds was materially false.

95.     In his signed response to the Letter of Notice, Defendant represented that the nonlawyers at CLS were not providing his CLS clients with legal services.

96.     Defendant's representation to the Grievance Committee that the nonlawyers at CLS were not providing his CLS clients with legal services was materially false.

Based on the foregoing Findings of Fact and with the consent of the parties, the Hearing Panel makes the following:

## CONCLUSIONS OF LAW

1.     All parties are properly before the Hearing Panel and the Panel has jurisdiction over Defendant, Daniel S. Rufty, and the subject matter of this proceeding.

2.     Defendant was properly served with the summons and complaint in this matter.

3.     Defendant's conduct, as set forth in the Findings of Fact above, constitutes grounds for discipline pursuant to N.C. Gen. Stat. § 84-28(b)(3) in that Defendant made knowing misrepresentations of facts or circumstances surrounding a complaint, allegation or charge of misconduct to the State Bar and pursuant to N.C. Gen. Stat § 84-28(b)(2) in that Defendant violated the Rules of Professional Conduct as follows:

a)    By permitting nonlawyers to provide legal services to North Carolina residents, thereby aiding others in the unauthorized practice of law, which is, pursuant to N.C. Gen. Stat. § 84-8, a criminal act in North Carolina, Defendant engaged in a criminal act that reflects adversely on his fitness as a lawyer in other respects, in violation of Rule 8.4(b) and assisted another person in the unauthorized practice of law, in violation of Rule 5.5(f);

b)    By falsely claiming to his CLS clients that the legal services they purchased from CLS would be provided by North Carolina attorneys when, in fact, the legal services were provided by nonlawyers, Defendant made false or misleading statements about his services in violation of Rule 7.1(a) and engaged in conduct involving dishonesty or misrepresentation, in violation of Rule 8.4(c);

c)    By allowing a portion of the fees collected by CLS from North Carolina consumers to be paid to nonlawyers engaged in the unauthorized practice of law, Defendant collected an illegal or excessive fee, in violation of Rule 1.5(a);

d)    By aiding CLS in debt adjusting, which is, pursuant to N.C. Gen. Stat. § 14-424, a criminal act in North Carolina, Defendant engaged in a criminal act that reflects adversely on his honesty, trustworthiness, or fitness as a lawyer in other respects, in violation of Rule 8.4(b);

e)    By failing to supervise nonlawyer employees of CLS and allowing them to provide legal services and advice to clients, thereby engaging in the unauthorized practice of law, Defendant failed to take reasonable efforts to ensure that his nonlawyer assistants were acting in accordance with Defendant's professional obligations, in violation of Rule 5.3(a);

f)    By failing to communicate with his CLS clients prior to their retaining CLS or during the representation when they had questions, Defendant failed to reasonably consult with his clients about the means by which the clients' objectives would be accomplished, in violation of Rule 1.4(a)(2), failed to keep the client informed about the status of the matter, in violation of Rule 1.4(a)(3), failed to promptly comply with reasonable requests for information, in violation of Rule 1.4(a)(4), and failed to explain a matter to the extent reasonably necessary to permit the clients to make informed decisions regarding the representation, in violation of Rule 1.4(b);

g)    By making numerous materially false representations to the Grievance Committee in his response to the Letter of Notice, Defendant knowingly made false statements of material fact in a disciplinary matter, in violation of Rule 8.1(a) and engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Rule 8.4(c);

h)    By failing to appear at his CLS clients' hearings and arbitrations and failing to file responsive pleadings on his clients' behalf, Defendant failed to represent his clients with diligence, in violation of Rule 1.3 and engaged in conduct prejudicial to the administration of justice, in violation of Rule 8.4(d);

i)    By allowing his nonlawyer assistants at CLS to tell his clients that if they withdrew from the representation the fees that they had paid to CLS for future legal services

would not be refunded, Defendant attempted to limit the clients' absolute right to discharge him, in violation of Rule 1.16(a)(3) and made misrepresentations about his fees, the services he would provide, and the clients' rights to terminate the representation, in violation of Rule 7.1(a) and Rule 8.4(c);

j) By not supervising the handling of entrusted funds paid by his North Carolina clients to CLS, Defendant failed to adequately supervise his assistants – employees of CLS – and their handling of entrusted funds, in violation of Rule 5.3(b)

k) By failing to deposit his CLS clients' entrusted funds into a trust account, Defendant violated Rule 1.15-2(a) and (b); and

l) By failing to maintain his clients' entrusted funds in accordance with the requirements of Rule 1.15 *et. seq.*, Defendant failed to maintain funds as required by the Rules of Professional Conduct, in violation of Rule 1.15-2(a).

Based on the foregoing Findings of Fact and Conclusions of Law and the consent of the parties, the Hearing Panel finds by clear, cogent and convincing evidence the following:

### FINDINGS OF FACT REGARDING DISCIPLINE

1. Defendant made multiple misrepresentations to his clients and the State Bar.

2. Though Blust was controlling CLS and its operations, Defendant was aware of the harm being caused to his clients, but failed to take any action to end the firm's unethical and illegal practices, thereby placing his own interests above the interests of his clients.

3. Members of the public posted complaints in various online forums about CLS's predatory and illegal practices.

4. CLS's predatory and illegal practices have undermined the confidence of many North Carolina consumers in the trustworthiness and honesty of lawyers.

5. Defendant's failure to file pleadings or to appear in court on his clients' behalf delayed and protracted the litigation of multiple cases across North Carolina, which foreseeably caused harm to the parties and the administration of justice.

6. Defendant's failure to render basic legal services on behalf of many of his clients or to communicate with his clients about critical developments in the cases foreseeably caused significant harm to his clients and impaired the clients' abilities to achieve the goals of the representations.

7. The clients CLS targeted and served were particularly vulnerable to scams due to their desperate financial situations.

8. By failing to respond to the Grievance Committee honestly, Defendant failed to participate in good faith in the legal profession's self-regulation process.

9.    During the grievance process, Defendant was being represented and advised by an attorney selected and paid for by Blust.

10.    Once Defendant obtained independent counsel, he undertook steps to ensure that his false responses were corrected and expressed remorse for his prior false statements.

11.    Defendant has no prior discipline.

12.    At the time Defendant started working for CLS -- and at the time of the disciplinary case against him -- Defendant was inexperienced in the practice of law.

13.    Defendant now acknowledges the harm he caused to his clients and the administration of justice and is remorseful for the same.

14.    Defendant has completely shut down CLS and returned all files to the clients with a sincere apology for the harm he and CLS caused.

15.    Defendant has agreed to cooperate with any and all investigations by any licensing, regulatory, or governmental agencies into the companies and individuals involved with CLS.

16.    Of his own volition, Defendant has withdrawn one million dollars from the primary CLS bank account and deposited it into an irrevocable trust and consented to the appointment of a trustee to disburse these funds to North Carolina consumers who have been harmed by CLS.

Based on the foregoing Findings of Fact, Conclusions of Law, Findings of Fact Regarding Discipline, and the consent of the parties, the Hearing Panel enters the following:

## CONCLUSIONS REGARDING DISCIPLINE

1.    The Hearing Panel has carefully considered all of the different forms of discipline available to it, including admonition, reprimand, censure, suspension and disbarment.

2.    The Hearing Panel has considered all of the factors enumerated in 27 N.C.A.C. 1B § .0116(f)(1) and determined the following factors are applicable in this matter:

(C) circumstances reflecting the defendant's lack of honesty, trustworthiness, or integrity;

(D) elevation of the defendant's own interest above that of the client;

(E) negative impact of defendant's actions on client's or public's perception of the profession;

(F) negative impact of the defendant's actions on the administration of justice;

(G) impairment of the client's ability to achieve the goals of the representation;

(H) effect of defendant's conduct on third parties;

(I) acts of dishonesty, misrepresentation, deceit, or fabrication; and

(J) multiple instances of failure to participate in the legal profession's self-regulation process.

3. The Hearing Panel has considered the factors enumerated in 27 N.C.A.C. 1B § .0116(f)(2) of the Rules and Regulations of the North Carolina State Bar and determined the following factor is applicable in this matter:

(A) acts of dishonesty, misrepresentation, deceit, or fabrication.

4. The Hearing Panel has considered all of the factors enumerated in 27 N.C.A.C. 1B § .0116(f)(3) of the Rules and Regulations of the North Carolina State Bar and determines that the following factors are applicable in this matter:

(A) prior disciplinary offenses in this state or any other jurisdiction, or the absence thereof;

(D) timely good faith efforts to make restitution or to rectify consequences of misconduct;

(H) effect of any personal or emotional problems on the conduct in question;

(I) effect of any physical or mental disability or impairment on the conduct in question;

(J) interim rehabilitation;

(N) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(P) remorse;

(R) vulnerability of victim; and

(S) degree of experience in the practice of law.

5. A censure, reprimand, or admonition would be insufficient discipline because of the gravity of the harm and potential harm to the clients, the profession, and the public.

6. While there is one of the factors enumerated in 27 N.C.A.C. 1B § .0116(f)(2) present, the Panel concludes disbarment is not the appropriate discipline in this case and that the

public will be adequately protected by suspension of Defendant's license with the possibility of a stay upon Defendant's compliance with numerous conditions designed to minimize the risk of future harm and ensure Defendant's continued compliance with the Rules of Professional Conduct.

7.     Discipline short of suspension would not adequately protect the public, the legal profession or the administration of justice for the following reasons:

    a.  The factors under Rule .0116(f)(1) are of a nature that support imposition of a suspension as the appropriate discipline; and

    b.  Entry of an order imposing less serious discipline would fail to acknowledge the seriousness of the offenses Defendant committed and would send the wrong message to attorneys and to the public regarding the conduct expected of members of the Bar of this state.

Based on the foregoing Findings of Fact, Conclusions of Law, Findings of Fact Regarding Discipline, Conclusions of Law Regarding Discipline, and the consent of the parties, the Hearing Panel hereby enters the following:

## ORDER OF DISCIPLINE

1.     The law license of Defendant, Daniel S. Rufty, is hereby suspended for five years, effective thirty days after service of this Order upon Defendant.

2.     Defendant is taxed with the administrative fees and costs of this proceeding, including the costs of Plaintiff's deposition of Defendant, the court reporters' appearance fees, and the Plaintiff's expense of obtaining the deposition transcript, and any other expenses.

3.     Defendant shall surrender his law license and membership card to the Secretary of the North Carolina State Bar no later than 30 days following service of this Order upon him.

4.     Defendant shall comply with the wind down provisions of 27 N.C.A.C. 1B § .0128 of the State Bar Rules.

5.     After serving no less than six months of the suspension, Defendant may apply for a stay of the remaining term of the suspension imposed by this Order by filing a motion in the cause with the DHC pursuant to 27 N.C. Admin Code 1B § .0118(c) and demonstrating by clear, cogent, and convincing evidence that Defendant:

    a.  Paid the administrative fees and costs of this proceeding, including the costs of Plaintiff's deposition of Defendant, the court reporters' appearance fees, and the Plaintiff's expense of obtaining the deposition transcript, and any other expenses;

b. Surrendered his law license and membership card to the Secretary of the North Carolina State Bar no later than 30 days following service of this Order upon him;

c. Complied with the wind down provisions of 27 N.C.A.C. 1B § .0128 of the State Bar Rules;

d. Kept the North Carolina State Bar Membership Department advised of his current physical business and home addresses (not post-office box or drawer addresses), telephone number(s), and email address(es) and notified the State Bar of any changes within ten days of such change;

e. Accepted all certified mail from the State Bar sent to the address on record with the State Bar Membership Department;

f. Provided full and complete responses to all communications from the State Bar, including communications from the Attorney Client Assistance Program ("ACAP"), within thirty days of Defendant's receipt of the communication or by the deadline stated in the communication, whichever is sooner, and participated in good faith in the State Bar's fee dispute resolution process for any petition filed with ACAP;

g. Remained current in payment of all State Bar membership dues, fees, and costs, including all Client Security Fund assessments and other charges or surcharges the State Bar is authorized to collect from him, including all judicial district dues, fees, and assessments incurred during the length of Defendant's suspension to the date of his filing a motion in the cause; Defendant provided proof of such payment to the North Carolina State Bar Office of Counsel within ten days of the date of payment;

h. Did not violate the Rules of Professional Conduct or the laws of the United States or of any state or local government, other than minor traffic violations, during the active suspension;

i. Fully and promptly cooperated with all government or regulatory or licensing agencies investigating CLS or any entity, law firm, third party, lawyer, or individual formerly or presently related to or in any way connected to CLS ("CLS related persons or entities"). "Fully and promptly cooperated" includes, at minimum, executing affidavits truthfully swearing to all facts and circumstances relating to his own acts and practices and relating to the acts and practices of CLS related persons or entities; submitting to interviews and depositions at the request of any such agency and truthfully and fully answering all questions posed to him during such interviews and depositions regarding his own acts and practices and regarding the acts and practices of all CLS related persons and entities; permitting the North Carolina State Bar Office of Counsel to share any and all documents related to his own acts and

practices and relating to the acts and practices of CLS related persons and entities with any agency; and testifying in judicial and quasi-judicial proceedings relating to his own acts and practices and relating to the acts and practices of CLS related persons or related entities; and

j. Entered into a contract with a practice monitor as described *infra* in paragraph 6.

6. If Defendant's application for a stay is granted, the stay shall remain in effect for the remaining period of the five-year suspension so long as Defendant complies and continues to comply with the following conditions during the stay:

a) Defendant shall keep the North Carolina State Bar Membership Department advised of his current physical business and home addresses (not post-office box or drawer addresses), telephone number(s), and email address(es) and notify the State Bar of any changes within ten days of such change;

b) Defendant shall accept all certified mail from the State Bar sent to the address on record with the State Bar Membership Department;

c) Defendant shall provide full and complete responses to all communications from the State Bar, including communications from the Attorney Client Assistance Program ("ACAP"), within thirty days of Defendant's receipt of the communication or by the deadline stated in the communication, whichever is sooner, and shall participate in good faith in the State Bar's fee dispute resolution process for any petition filed with ACAP;

d) Defendant shall remain current in payment of all State Bar membership dues, fees, and costs, including all Client Security Fund assessments and other charges or surcharges the State Bar is authorized to collect from him, including all judicial district dues, fees, and assessments; Defendant shall provide proof that he has paid such dues, fees, or costs to the North Carolina State Bar Office of Counsel within ten calendar days of paying them;

e) Defendant shall not violate the Rules of Professional Conduct or the laws of the United States or of any state or local government, other than minor traffic violations, during the stay of this suspension;

f) Defendant shall fully and promptly cooperate with any government or regulatory or licensing agency investigating CLS or any entity, law firm, third party, lawyer, or individual formerly or presently related to or in any way connected to CLS; the North Carolina State Bar Office of Counsel shall have sole authority to determine if Defendant has "fully and promptly cooperated" as required by this paragraph; such cooperation may include, but is not limited to, executing affidavits truthfully swearing to the facts and circumstances and practices of CLS or related entities, submitting to interviews or depositions regarding the facts and circumstances and practices of CLS or related entities, permitting the North Carolina State Bar

Office of Counsel to share any and all documents related to Defendant or CLS with others, or testifying in court regarding the facts and circumstances and practices of CLS or related entities;

g) Within thirty days after entry of this Order, Defendant shall arrange for an active member of the North Carolina State Bar to serve as his law practice monitor. Defendant's monitor shall be an attorney in good standing who practices law in the judicial district in which Defendant practices law and who has been approved in advance by the North Carolina State Bar Office of Counsel;

h) Defendant will pay all costs and/or fees, if any, charged by the monitor for his/her supervision. Within five days of the date Defendant reaches an agreement with the monitor to provide the monitoring services, Defendant shall supply the North Carolina State Bar Office of Counsel with a letter from the monitoring attorney confirming his or her agreement to perform the duties listed herein;

i) The monitor shall meet with Defendant each month of the stay of this suspension. At each meeting, Defendant and the monitor must review each of Defendant's pending cases, identifying the anticipated course of the representation and any scheduled court dates, and Defendant's communications with his clients. Defendant and the monitor must also review at least one case in detail in each area of law in which Defendant is practicing, with discussion including but not limited to identification of applicable statutory and regulatory authorities, identification of potential legal issues, plan of representation, and the appropriate roles of any nonlawyer assistant in each case. Defendant shall come to each meeting prepared to discuss these topics and shall provide to the monitor in advance of the meeting all information needed to ensure the monitor's meaningful participation in the meeting;

j) Defendant shall ensure that the monitor submits monthly written reports of these meetings and discussions to the North Carolina State Bar Office of Counsel; such reports are due on the last Friday of each month as such dates occur through the duration of the stay of this suspension;

k) No sooner than one year prior to the conclusion of Defendant's suspension, he my petition the Panel to remove the practice monitor requirement. In order to have this petition granted, Defendant shall have the burden of showing the Panel by clear, cogent, and convincing evidence that (i) Defendant never missed a meeting with the practice monitor, (ii) Defendant never failed to timely pay the practice monitor, (iii) Defendant never failed to provide the practice monitor with information or documents requested by the practice monitor, and (iv) the practice monitor agrees that monitoring is no longer necessary;

l) Defendant shall timely comply with all State Bar Continuing Legal Education ("CLE") requirements as set forth in 27 N.C.A.C. 1D § .1518 and pay all fees and costs assessed by the applicable deadline and shall provide proof of same to the

North Carolina State Bar Office of Counsel within ten calendar days of completing the courses;

m) Defendant shall complete an additional twelve hours of CLE courses each year of the stay, at least six of which must be on ethics and two of which must be devoted to the topic of trust account management; these courses are in addition to the normal CLE requirements set forth in 27 N.C.A.C. 1D § .1518 and required of Defendant by the immediately preceding paragraph; Defendant shall provide proof that he completed these additional courses to the North Carolina State Bar Office of Counsel within ten calendar days of completing the courses;

n) Defendant shall not engage in or work with any entity, lawyer, or law firm providing debt relief services without (1) providing written notice of such to the North Carolina State Bar Office of Counsel, (2) receiving written permission from the North Carolina State Bar Office of Counsel to work for, participate in, or associate with said entity, lawyer, or law firm, and (3) thereafter providing the North Carolina State Bar Office of Counsel with any documents the North Carolina State Bar Office of Counsel requests pursuant to that association;

o) Defendant shall not participate in or associate with any business entity, third-party service provider, lawyer or law firm engaged in providing legal services in more than one state without: (1) providing written notice of such to the North Carolina State Bar Office of Counsel, (2) receiving written permission from the North Carolina State Bar Office of Counsel to work for, participate in, or associate with said business entity, third-party service provider, lawyer or law firm, and (3) thereafter providing the North Carolina State Bar Office of Counsel with any documents the North Carolina State Bar Office of Counsel requests pursuant to that association;

p) If Defendant opens an attorney trust account in connection with his law practice during the stay of this suspension, Defendant shall notify the North Carolina State Bar Office of Counsel of the existence of such account within five days of opening the account and shall arrange for an active member of the North Carolina State Bar to monitor Defendant's trust account practices. Defendant's trust account monitor shall be an attorney in good standing who practices law in the district in which Defendant will practice law during the stay of the suspension and who has been approved in advance by the North Carolina State Bar Office of Counsel;

q) Defendant will pay all costs and/or fees, if any, charged by the trust account monitor for his or her supervision. Defendant must make all arrangements for this monitoring attorney. Within five business days of Defendant reaching an agreement with the monitoring attorney to provide the monitoring services, Defendant shall supply the North Carolina State Bar Office of Counsel with a letter from the monitoring attorney confirming his or her agreement to perform the duties listed below;

r) The trust account monitor shall supervise Defendant in preparing and submitting to the North Carolina State Bar Office of Counsel all documentation required to be maintained pursuant to the Rules of Professional Conduct. The reconciliations shall be performed using the reconciliation method described in the State Bar Lawyer's Trust Account Handbook and using the reconciliation form provided therein. Defendant shall meet quarterly with the monitoring attorney and provide any information the monitoring attorney deems reasonably necessary to ensure Defendant is properly managing his attorney trust account(s). Defendant shall ensure that trust account documentation for each quarter are received by the North Carolina State Bar on the last day of the month immediately following the end of each quarter (e.g., the reconciliation report for the first quarter of each year is due by April 30 and the reconciliation report for the second quarter of each year is due by July 30);

s) The monitor must agree to sign each reconciliation report to indicate that he or she supervised the creation of each report. Defendant bears the responsibility of ensuring the monitoring attorney signs each reconciliation report and that all documentation is timely submitted to the North Carolina State Bar Office of Counsel as described above;

t) Defendant shall make appropriate arrangements for an alternate monitor if the original monitoring attorney cannot serve or is unwilling to serve throughout the duration of the stay of this suspension;

u) If another lawyer with whom Defendant practices law is responsible for administration of entrusted or fiduciary funds in a general or dedicated trust account ("responsible attorney"), in lieu of the provisions of paragraphs 6(p) through (t) above, Defendant shall submit to the North Carolina State Bar Office of Counsel for each quarter an affidavit signed by Defendant stating (1) that Defendant is not responsible for the administration of any general or dedicated trust account(s), (2) that Defendant does not have signature authority over such trust account(s), and (3) the name, address, and telephone number of the responsible attorney; and

v) If Defendant does not practice law with a responsible attorney as outlined in paragraph 6(u) above, does not have a general or dedicated trust account, and has not handled entrusted funds for any reportable quarter, in lieu of the provisions of paragraphs 6(p) through (t) above, Defendant shall submit to the North Carolina State Bar Office of Counsel for each quarter an affidavit signed by Defendant stating (1) that Defendant does not practice law with a responsible attorney as outlined in paragraph 6(u), (2) that Defendant does not maintain a general or dedicated trust account, and (3) that Defendant has not received or otherwise handled any entrusted or fiduciary funds as defined in Rule 1.15-1 of the North Carolina Rules of Professional Conduct.

6.    If during the stay of the suspension Defendant fails to comply with any one or more of the conditions stated in paragraph 6(a) through (v) above, the stay of the suspension of

Defendant's law license may be lifted as provided in Rule .0118(a) of the North Carolina State Bar Discipline and Disability Rules (27 N.C. Admin. Code 1B § .0118).

7.     If the stay of the suspension is lifted and the suspension is activated for any reason, Defendant may seek a stay of after serving the activated suspension by filing a petition pursuant to Rule .0129(b) of the North Carolina State Bar Discipline and Disability Rules (27 N.C. Admin. Code 1B § .0129) demonstrating compliance with the requirements therein as well as the following requirements by clear, cogent, and convincing evidence:

a)  That Defendant properly wound down his law practice and complied with the terms of Rule .0128 of the North Carolina State Bar Discipline & Disability Rules (27 N.C. Admin. Code 1B § .0128);

b)  That Defendant submitted his license and membership card to the Secretary of the North Carolina State Bar within thirty days after the date of the order lifting the stay and/or activating the suspension of his law license;

c)  That Defendant kept the Membership Department of the State Bar advised of his current physical business and home addresses (not post-office box or drawer addresses), telephone number(s), and e-mail address(es) following the entry of this Order;

d)  That Defendant accepted all certified mail from the State Bar sent to the address on record with the State Bar Membership Department;

e)  That Defendant provided full and complete responses to all communications from the State Bar, including communications from ACAP, within thirty days of Defendant's receipt of the communication or by the deadline stated in the communication, whichever is sooner, and participated in good faith in the State Bar's fee dispute resolution process for any petition filed with ACAP;

f)  That Defendant remained current in payment of all State Bar membership dues, fees, and costs, including all Client Security Fund assessments and other charges or surcharges the State Bar is authorized to collect from him, including all judicial district dues, fees, and assessments;

g)  That Defendant did not violate any of the Rules of Professional Conduct or the laws of the United States or of any state or local government, other than minor traffic violations, following the entry of this Order;

h)  That at the time of his petition for reinstatement, there is no deficit in Defendant's completion of mandatory CLE hours, in reporting of such hours, or in payment of any fees associated with attendance at CLE programs;

i)  That Defendant paid the costs and administrative fees of the proceeding that resulted in activation of the suspension as assessed by the Secretary by the date of the filing of his petition for reinstatement; and

j) That Defendant complied with any other conditions the Hearing Panel imposed for reinstatement as stated in the order lifting the stay of the suspension of Defendant's law license.

8.     If the stay of suspension is lifted and the suspension is activated for any reason, and if Defendant fails to fully comply with 27 N.C. Admin. Code 1B § .0128, Defendant shall reimburse the State Bar for any expenses incurred by the State Bar in winding down Defendant's practice. Such expenses may include, but are not limited to, storage facility fees, rent payments, moving expenses, charges for secure disposal of client files, postage or other mailing expenses, and compensation paid to an appointed trustee and/or a trustee's assistant(s) for time and travel associated with the trusteeship. The State Bar shall send an invoice of wind-down expenses to Defendant at Defendant's last known address of record with the North Carolina State Bar. Defendant shall not be eligible for reinstatement until he has reimbursed the State Bar for all wind-down expenses incurred and has satisfied all requirements of 27 N.C. Admin. Code 1B § .0129.

9.     Defendant is taxed with the administrative fees and costs of this action as assessed by the Secretary of the North Carolina State Bar which shall be paid within thirty days of service of the statement of costs upon Defendant.

Signed by the undersigned Hearing Panel Chair with the consent of the other Hearing Panel members.

This the 8th day of April 2021.

Richard V. Bennett, Chair
Disciplinary Hearing Panel

Agreed and consented to by:

Joshua T. Walthall
Attorney for Plaintiff

Dudley A. Witt
Attorney for Defendant

Savannah B. Perry
Attorney for Plaintiff

Daniel S. Rufty
Defendant