## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JULIA BRIGGS, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>STRATEGIC FINANCIAL SOLUTIONS, LLC, VERSARA LENDING, LLC, and JOHN DOES 1-100. )<br><br>Defendants. ) | Case No.: 1:22-cv-3705<br>Judge: Hon. Edmond Chang<br><br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT[1]

Plaintiff Julia Briggs ("Plaintiff"), through her undersigned attorneys, brings this class action complaint against Defendants Strategic Financial Solutions, LLC ("SFS"), its subsidiary Versara Lending ("Versara" collectively, the "Defendants"), and John Does 1-100 ("Doe Defendants") individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, the basis of which information and belief includes government and private court proceedings and interviews with a confidential informant ("CI1") as well as other information uncovered in an investigation conducted by her attorneys:

---

[1] This complaint is amended pursuant to ECF No. 3, Judge Chang's minute entry of August 3, 2022, which requires Plaintiffs to further clarify jurisdiction pursuant to the Class Action Fairness Act. *See* ¶¶ 22-23.

**NATURE OF THE ACTION**

1.      SFS was created in the wake of actions by the Illinois Attorney General that shuttered the last debt-relief organization with which its Chief Executive Officer was involved, and resulted in the disbarment of two attorneys who ran the organization.[2] SFS is the central actor of an ongoing fraudulent scheme by which it and its affiliates (including lawyers and law firms) bill for services as debt relief consultants, but in fact do collectively little negotiating, bill their clients more than is permissible under state statutes for debt relief services, and expose their clients to default, lawsuits and other consequences.

2.      Defendants' business relationship is carefully constructed to maximize their billing opportunities while obscuring the relationship between SFS and its affiliates.    SFS (1) uses fictional intermediaries to locate debtors and offers services other than debt relief to entice them; (2) recruits lawyers or law firms to act as client interfaces without disclosing SFS's role; (3) initiates and controls the billing relationship with the client; and (4) causes all communications with the client to be directed to SFS's own employees at its own call center, again without disclosure to the client.

3.      Debt relief companies are strictly regulated by states, as well as by the FTC.  These regulations strictly limit fees non-attorney debt relief companies may charge, and set specific requirements as to when those fees may be collected by the companies, namely after the successful completion of services.  In essence, non-attorney debt relief companies in the states in which SFS and its affiliates operate are typically limited to contingency payments only, based on the amount of debt reduction they achieve.

---

[2]    https://www.lisamadigan.org/in-the-news/2018/3/13/chicago-law-debt-settlement-firm-to-wind-down-business  (last accessed July 15, 2022).

4.      Almost all states with such regulations exempt lawyers, whose provision of debt-relief services are regulated only by the attorney ethics laws and rules of their jurisdictions. Accordingly, without exception, lawyers are permitted to charge on an hourly, or weekly, or monthly basis when they are retained in order to negotiate debt relief.

5.      Defendant SFS has created a network of attorneys.  SFS recruits attorneys into this network to form affiliate firms ("Affiliate firms" or "Affiliate law firms") with the commitment that it will find clients for them in the debt relief practice by advertising (which SFS pays for), facilitate the client signup process (including sending a notary, which SFS pays for), and ensure regular withdrawals from the clients' bank accounts (through a payment processor hired and paid for by SFS).  SFS then takes a majority portion of both the up front and monthly fees deducted. This practice constitutes both fee-sharing with nonlawyers as well as improper handling of entrusted client funds.

6.      The debt relief clients invariably are recruited by SFS through a web of advertising entities purporting to be debt consolidation lenders, but which upon investigation are simply fictitious names that are extensions of SFS's marketing department.  SFS uses these names to conduct direct mail and internet advertising.  Once the clients contact SFS, employees at the call center encourage the client to instead sign up for debt relief representation.

7.      Once the client has agreed to the representation, SFS, not the affiliate law firm, hires and dispatches a notary to the client's residence to have the client sign a purported retainer agreement with what purports to be the Affiliate firm even though the Affiliate firm is not even notified of the client's existence until SFS has begun the bank withdrawal process and the client believes the relationship with the affiliate firm to have begun.

8.     Following the client's signing of the purported retainer agreement, SFS notifies the Affiliate firm of the existence of the client, forwards on the purported retainer agreement to the Affiliate firm for countersignature (a process which often does not occur), and instructs the Affiliate firm to hold an introductory consultation with the new client, generally around half an hour.

9.     The purported retainer agreement form is drafted and supplied by SFS to the client, and it does not identify SFS, only the Affiliate firm.  It does provide for withdrawal of funds, first with an up-front fee, and then a monthly fee.  The withdrawal appears on the client's bank statement as a third-party payment processor.  The withdrawals do not identify which payments go to which entity.

10.     The purported retainer agreements are notarized, either in person by mobile notaries, or remotely.  The notaries also provide the clients with paperwork for the direct bank withdrawals.

11.      Clients pay up front followed by monthly fees, and not a contingent share of the debt relief result achieved.  Up front payments are permissible for attorneys (when client funds are maintained in a trust account, which is never the case for Defendants' clients), but for all the states at issue, this type of monthly billing is impermissible for non-attorney debt relief services. However, the attorneys at the Affiliate firms do not personally contact creditors.  All the actual work is done by SFS and its call center. SFS is not a law firm and could only lawfully bill on a contingent basis in the states in which it operates behind Affiliate firms (which is far less lucrative, because actual debt reduction is not easily achieved).  SFS goes to elaborate lengths to conceal its identity and involvement, presence, and especially the reality that its employees are performing any actual debt negotiation.

12.     Investigation has revealed that these law firms, such as the Affiliate firm assigned to Plaintiff, Burnette Legal Group, LLC d/b/a Monarch Legal Group ("Monarch"), receive a percentage of monthly charges paid by the client to SFS's billing processor (generally between 3% and 10%), with the lion's share going to SFS.  Despite appearing on the purported retainer agreement and receiving a share of billings that are only permissible for lawyers' work, the Affiliate firms delegate all meaningful work to SFS and Versara without supervision.  In so doing, the Affiliate firms risk professional discipline.  As stated above, a prior incarnation of SFS was sued by the Illinois Attorney General, and two lawyers who were its name partners were disbarred as a result of their conduct.  Now, SFS outsources the risk of being an attorney in a debt relief practice without zealously seeking to achieve a result to the Affiliate firms.

13.     Client calls to the Affiliate firms are routed to an SFS call center.  The Affiliate firms are generally run by one or two attorneys (in the case of Monarch, one Timothy Burnette) who themselves often employ contract attorneys who may hold a single call with the client to set up the fiction that the Affiliate firm will be doing the substantive work of debt negotiation.   What little work is done for the client is farmed out to contract attorneys who maintain few, if any files, and do no actual negotiations with the clients' creditors.  According the CI1, the attorneys' duties are limited to obtaining client approval for settlements and making appearances in court when a client has been sued by a creditor.[3]

14.     According to CI1, SFS also answers all calls to the Affiliate firms as if it were those Affiliate firms, and it pretends to route queries to those firms.  The Affiliate firms ostensibly maintain their own websites, but the phone numbers on those websites all route to the SFS call

---

[3] Both the Plaintiff's personal experience as well as the findings of the North Carolina Disciplinary Hearing Commission of the State Bar (discussed further *infra*) indicates that attorneys seldom, if ever, appear in court for their clients in this scheme.

center. However, the Affiliate firms have almost no further responsibilities in the debt negotiation, unless a client is sued in court by a creditor.

15.     SFS self-describes its annual revenue as $125.5 million.[4]

16.     This scheme is deceptive. The clients do not know that SFS is the entity that recruits them, do not know its relationship to the lawyer who represents them, do not know that SFS's billing processors withdraw from their accounts, do not know that SFS does the work of any negotiation, and do not know that SFS gets a share of the fees they pay. This arrangement is a consumer fraud.

17.     Plaintiff seeks relief in this action individually, and on behalf of all clients of SFS and the Affiliate firms, under common law and state consumer protection statutes as identified herein.

## JURISDICTION AND VENUE

18.     This Court has supplemental jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(d), Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendants' states of citizenship.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiff and the Class's claims occurred in this District and because Defendants transact business and/or have agents within this District.

## PARTIES

20.     Plaintiff Julia Briggs is a citizen of the State of Illinois, residing in DuPage County.

---

[4] https://lensa.com/negotiation-specialist-jobs/buffalo/jd/88107d1921a68723a542195b8fd8ef9b (last accessed July 15, 2022).

21.     Ms. Briggs received an advertisement from an SFS affiliate purporting to be a debt consolidation lender.  Plaintiff called the number provided, but instead of being offered a debt consolidation loan, she was advised to retain a debt relief attorney.  The call center operation she spoke with identified to her Monarch Legal Group.  On September 18th, 2020, Plaintiff signed a purported legal representation agreement with Monarch Legal Group to assist in the settlement of her consumer debts.

22.     Defendant Strategic Financial Solutions, LLC ("SFS") is a Nevada corporation headquartered in Amherst, New York, at 115 Lawrence Bell Drive.  According to the Nevada Secretary of State, the members of SFS are "eVestment, Inc." of One Liberty Plaza, 49th FL, New York, NY, 10006 and Eugene Luciani of 100 Glenridge Point Parkway, Suite 100, Atlanta, GA, 30342.

23.     Defendant Versara Lending, LLC ("Versara") is, according to Delaware corporate records, a wholly-owned subsidiary of SFS.  Its principal place of business is at 115 Lawrence Bell Drive, Amherst, New York.  On information and belief, Versara is a wholly-owned subsidiary of SFS, making SFS the sole member of Versara.

24.     Upon information and belief, Defendants John Does 1-100, whose identities and roles will be developed through discovery and Plaintiff's independent investigations, are additional individuals who have conspired with the other Defendants to claim to provide legal representation for debt relief services, while, in fact, being part of the greater scheme laid out *infra.*.

## FACTUAL ALLEGATIONS

## BACKGROUND

### A.  Legal Helpers is Shut Down

25.     The CEO of SFS is Ryan Sasson ("Sasson"), the former head of client support, negotiation, and settlement for Chicago-based Legal Helpers Debt Resolution, LLC ("Legal Helpers")[5] and the CEO of the (apparently now defunct) Legal Helpers subsidiary, LHDR Help, LLC ("LDHR").

26.     Legal Helpers and LDHR were at the heart of a fraudulent scheme that the Illinois Attorney General described as "a 'front' to collect hefty fees from struggling consumers."[6]

27.     This scheme, as alleged by the Illinois Attorney General, "contract[ed] virtually all debt relief services to a third party operated and staffed by non-lawyers" and "charge[d] advanced fees which [we]re unfair and in violation of the [Illinois Debt Settlement Consumer Protection Act]" leading to hundreds of complaints to the Attorney General's office.[7]

28.     Legal Helpers faced a series of lawsuits in 2012 in at least Illinois, California, and New Jersey relating to its illegal and fraudulent collection of fees relating to debt relief and debt settlement.[8]

29.     Additionally, in 2012, Legal Helpers agreed to refund $2.1 million to Illinois customers and wind down operations as part of a settlement with the Illinois Attorney General.

---

[5] *See* https://getoutofdebt.org//wp-content/uploads/2012/04/sasson.pdf at ¶1. (last accessed July 15, 2022).
[6]  https://www.lisamadigan.org/in-the-news/2018/3/13/chicago-law-debt-settlement-firm-to-wind-down-business (last accessed July 15, 2022).
[7]  https://www.isbamutual.com/liability-minute-emerging-legal-issues/illinois-attorney-general-providing-debt-settlement-services/ (last accessed July 15, 2022).
[8]*See* https://getoutofdebt.org/46264/ryan-sasson-legal-helpers-debt-resolution-and-others-sued-by-employees-new-york-class-action-suit (last accessed July 15, 2022)

30. Legal Helpers also agreed, as part of the 2012 settlement with the Illinois Attorney General to cease accepting new Illinois clients.[9]

31. The Illinois Secretary of State revoked Legal Helpers' business license on October 10, 2014.

32. Two of the managing partners of Legal Helpers, Thomas Macey and Jeffrey Aleman, were suspended from practicing law in Illinois, a suspension that continues as of the time of this writing. The Illinois Attorney Registration and Disciplinary Commission found, in relevant part, that:

> [Messrs. Macey and Aleman] owned and managed a law firm named Legal Helpers Debt Resolution and represented thousands of people in Illinois and throughout the country with consumer debt problems. Rather than perform legal services through their firm, they subcontracted the performance of nearly all services to non-lawyer debt settlement companies in other states. Non-lawyer employees for those companies regularly provided legal advice to clients and commonly answered client legal questions that arose. Messrs. Macey and Aleman did not implement a meaningful system to supervise the non-lawyers to whom they delegated client matters. Consequently, they assisted in the unauthorized practice of law and systematically violated disciplinary rules requiring attorney consultation and communication with clients.[10]

**B. Founding of SFS**

33. Sasson, on information and belief, is not now, and has never been a licensed attorney. Exempt from attorney disciplinary rules, he escaped the collapse of Legal Helpers without sanction, but even before Legal Helpers fully ceased operations, Sasson began a new venture with a highly similar business model: SFS.

34. The main difference between Legal Helpers and SFS, is that SFS, instead of subcontracting its work to a network of non-lawyers (as Legal Helpers did), instead recruits non-

---

[9] *See* https://www.chicagotribune.com/business/ct-xpm-2012-07-09-chi-law-firm-to-pay-21-million-settlement-in-debt-scam-20120709-story.html (last accessed April 3, 2022)

[10] From the public disciplinary record of Jeffrey Aleman, found at https://iardc.org/Lawyer/SearchResults#, (last accessed July 15, 2022)

employee attorneys who appear unconnected to it, who then act as the face of the enterprise to clients. Investigation, including a confidential informant, and agency findings in North Carolina discussed *infra*, have revealed that SFS receives by far the largest share of the fee and interacts with the clients after initial consultation, but it employs no lawyers to do debt negotiation.

35.     However, even if SFS uses or used its own attorneys to do debt negotiation, this scheme would still fall afoul of Model Rule 5.4, adopted with substantial similarity in all states at issue, as the debt negotiators directly hired by SFS take direction from supervisors regarding the negotiation of debt relief and non-lawyers (such as Sasson) ultimately receive the fees billed for client services.

## **DEFENDANTS' SCHEME**

### C. **Facts Specific to Plaintiff Briggs**

36.     On or around September 15th, 2020, Plaintiff was contacted with a letter from a fictional entity called Polo Funding ("Polo"), offering Plaintiff a debt consolidation loan for Plaintiff's consumer debts.

37.     Plaintiff called the telephone number listed on the Polo Funding letter and was put in contact with an unidentified individual who claimed to be working on behalf of Monarch, but on information and belief worked for Versara.

38.     After expressing interest in debt relief, Plaintiff received, from a Monarch email address, a purported retainer agreement with Monarch to Plaintiff.  On information and belief the basis of which is CI1 and attorney disciplinary proceedings discussed further *infra*, the routine practice was and is that SFS drafts the purported retainer for the client and Affiliate firm but did not and does not advise the Affiliate firm of the potential client retention until the client has already executed it.

39.     An employee of SFS subsidiary Defendant Versara then scheduled an appointment between Plaintiff and a notary public to review the purported retainer agreement. On information and belief, the basis of which is CI1 and attorney disciplinary proceedings discussed further *infra*, SFS hired and dispatched the notary public to Plaintiff's home without the knowledge or involvement of Monarch.

40.     Defendants SFS and Versara required that an ACH payment plan be set up through Plaintiff's bank. This payment plan used SFS's payment processor, RAM Payment. This was accomplished as a form presented to Plaintiff by the notary public, which Plaintiff filled out and returned two days after signing the purported retainer agreement.

41.     Following the initial call with Versara, on September 18, 2020, SFS dispatched to Plaintiff a notary working for 3T Mobile Notary, LLC, Tiphanie Williamson. Ms. Williamson brought with her to the appointment a physical copy of the purported retainer agreement previously provided to Plaintiff. Plaintiff then signed the purported retainer agreement that day in Ms. Williamson's presence and was told by Ms. Williamson that a counter-signed agreement would be e-mailed to Plaintiff.

42.     On September 24, 2020, only after executing a purported retainer agreement and arranging direct withdrawals from her bank account to SFS's billing processor, Plaintiff participated in a videoconference with a Monarch contract attorney, James Feliksik. He explained that he was Plaintiff's attorney and that if Plaintiff needed anything, he would be there for her.

43.     Plaintiff never met face to face with Mr. Feliksik nor ever spoke with him again.

44.     After the videoconference on September 24, 2020, Plaintiff received a copy of the agreement from the Monarch email address bearing her signature. Monarch never provided to Plaintiff a countersigned agreement.

-11-

45.     In the fourteen-month course of Monarch's purported representation of Julia Briggs, Julia Briggs paid Monarch approximately $8,847.98 minus approximately $3,666.78 that was refunded to her as settlement reserves.

46.     Ms. Briggs' client file, once turned over to Ms. Briggs' present counsel, contained only a non-countersigned purported retainer agreement and a settlement letter proffered by JC Penney regarding one minor debt of approximately five hundred dollars.  It contained no notes, memoranda, or correspondence regarding any further efforts to negotiate down Ms. Briggs' debts.

47.     The process by which Plaintiff was established as a client of Defendants (nominally of Monarch) was and continues to be the standard practice for SFS, Versara, and the Affiliate law firms, including Monarch.

48.     On the date Plaintiff signed the purported retainer agreement, Plaintiff had seven creditors, which she identified in her intake paperwork, with identified total debts of $20,303.00.

49.     In the course of their debt negotiations, SFS was able to settle one small debt of Plaintiff's with JC Penney of $544 for $302. On information and belief, all seven of Plaintiff's listed creditors received correspondence from SFS that indicated that she was represented by Monarch, but no such correspondence was maintained in Monarch's files.  On information and belief, the basis of which is standard practice of SFS as provided by CI1 as well at state disciplinary hearings as described *infra*, the correspondence in Monarch's name was actually drafted and sent by SFS.  No responsive correspondence from any debtor was present in Plaintiff's file at Monarch. On information and belief, the basis of which is standard practice of SFS as provided by CI1 as well at state disciplinary hearings as described *infra*, responses from the creditors were sent to SFS by Monarch.

50. In spite of the minimal progress on settling her debt and complete lack of attorney effort towards that end, Defendants continued to bill Plaintiff every month for additional payments for which Defendants have presented no evidence they did any work beyond settling the lone JC Penney debt.

51. Plaintiff called the number provided by Monarch numerous times, but never received a return call or email from any Defendant regarding her queries.

52. In the course of Monarch's purported legal representation of Plaintiff, Plaintiff was sued by Citibank, N.A. on July 12, 2021 for $12,518.56. Monarch was put on notice of this lawsuit on or about August 27, 2021 when Plaintiff Briggs was served with the lawsuit and Plaintiff uploaded the summons to Defendants' web portal.

53. An attorney representative failed to appear or file an answer to the suit before the first hearing date on October 26, 2021.

54. On or about November 5, 2021, Julia Briggs terminated the purported legal representation of Monarch.

55. In November, 2021, Plaintiff was refunded the amount held in trust for her, but not refunded the other fees charged by Monarch and SFS. If SFS had billed Ms. Briggs only for the proportion of debt reduction actually achieved as permitted for non-attorney debt reduction businesses, it and its affiliates would have been entitled only to $86.23.

**D. Requirements for Attorney-Client Agreements Among the States at Issue**

56. When preparing legal representation agreements for potential clients, SFS is at pains to include language that waives the right to sue on a classwide basis as well as requiring arbitration of any claims against the Affiliate firms.

57.    As is the case with Plaintiff's agreement, and as discussed in several of the complaints identified by Plaintiff, the Affiliate firms seldom bother to countersign the agreements.[11]

58.    Additionally, as stated *supra* in paragraphs 37 and 38, the terms of the class waivers and mandatory arbitration clauses are, at the direction of SFS and not the Affiliate firms, presented to clients via the notary and not by the attorney signator, who at that point has not even been informed of the purported retention.

59.    This runs contrary to the rules of professional conduct of numerous states. Model Rule 1.8(h)(1), which has been substantially adopted by most of the relevant states says that, "A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement."  Most of the states at issue here have either adopted or strengthened this protection:

    a.    California requires that arbitration clauses in attorney-client agreements are only ethical and enforceable if the client obtains independent counsel to advise the client on the advisability of entering into such an agreement or if advised **by the lawyer** to seek the advice of an independent lawyer of the client's choice regarding the settlement and given a reasonable opportunity to seek that advice.[12]  (emphasis added).

---

[11] *See Johnson v. Strategic Financial Solutions, LLC et al.*, Case No. 05-2019-CA-057725-XXXX-XX, Cir. Ct. Brevard Cty., Florida., Dkt. No. 1 at ¶ 137; *see also Hughes et al. v. Strategic Financial Solutions, LLC et al.*, Case No. 3:20-cv-1096, D. Conn., ECF No. 1-2 at ¶ 69.; *Burr v. Strategic Financial Solutions, LLC et al.*, Case No. CV-19- 6026882-S, Conn. Sup. Ct. Middletown, Compl. at ¶ 126.
[12] Cal. Rules of Professional Conduct 1.8.8.

b.  Florida prohibits a lawyer from making an agreement that prospectively limits the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement.[13]

c.  Maryland requires that arbitration clauses in attorney-client agreements are only enforceable if the client obtains independent counsel to advise the client on the advisability of entering into such an agreement.[14]

d.  Michigan requires that arbitration clauses in attorney-client agreements are only ethical and enforceable if the client obtains independent counsel to advise the client on the advisability of entering into such an agreement.

e.  Missouri requires that any binding arbitration language in an attorney-client agreement must be pointed out to the client and orally explained **by the attorney** in such a way that the client understand it.

f.  New Jersey requires that arbitration clauses in attorney-client agreements must be explained, **by the lawyer**, "to the extent reasonably necessary to permit the client to make informed decisions" about "the representation."[15]  Further, such explanations must generally be more detailed than those found in typical commercial contracts.

g.  New York requires that arbitration clauses in attorney-client agreements are made subject to a disclosure of the material differences between arbitration and litigation

---

[13] Fl. Rules Prof. Conduct 1.8(h).
[14] Maryland Lawyers' R. of Prof. Conduct 1.8(h).  See also See Md. Ethics Docket No. 90-12.

[15] N.J. Ct. R. 1.4(b).

which take into account the relative sophistication of the client when making such disclosures.

h.  Pennsylvania requires that for any attorney-client agreement that limits the rights of a client due to attorney malpractice the client must be independently represented.

i.  Tennessee prohibits lawyers entirely from making agreements that limit clients rights in the event of attorney malpractice.

j.  Wisconsin requires that arbitration clauses in attorney-client agreements are only enforceable if the client obtains independent counsel to advise the client on the advisability of entering into such an agreement.

k.  Wyoming requires that arbitration clauses in attorney-client agreements are only enforceable if the client obtains independent counsel to advise the client on the advisability of entering into such an agreement.

60.   Additionally, the American Bar Association has taken the formal position that binding arbitration should only be permissible when the client has "fully apprised of the advantages and disadvantages of arbitration **and** has given her informed consent to the inclusion of the arbitration provision in the retainer agreement."[16] (emphasis added)

61.   Beyond that, however, the terms of the purported attorney-client agreements are violative of Model Rule 1.4(a)(1), which every state has adopted in a substantially similar way, which require that a lawyer shall "promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules."  Investigation has revealed that it was standard practice for the Affiliate firms not to perform actual debt relief negotiations and instead for  all negotiations to be performed by SFS, a

---

[16] ABA Formal Opinion 02-425 (2/20/2002)

non-party to the contract, and its non-lawyer staff; and further, that the attorney or attorneys at the Affiliate firm had no control or oversight of the SFS personnel actually undertaking the work. This relationship, where the lawyer is essentially a front, is the very most material fact about the representation. This relationship (if it were permissible, which it is not) would require informed consent on the part of the clients.

62. Furthermore, the entire agreement is drafted by SFS, caused to be transmitted to the client via SFS, returned to SFS, and SFS begins performance in the form of beginning the process of withdrawing funds from the clients' accounts, all before the Affiliate firm even learns of the new client's existence.

63. To the extent the purported retainer agreements drafted and executed by SFS and their agents purport to impose arbitration requirements or class waivers, each such provision is void and unenforceable because under the circumstances of these relationships, no such provision is permissible. The requirements of separate representation and/or explanation by the lawyer to the client are absent, full disclosure of the nature of the relationship between the Defendants concerning the relationship is absent and the provisions are substantively unconscionable on the facts presented. The Affiliate firms may not impose arbitration or a class waiver, and SFS and Versara, as strangers to the contract whose role is concealed, may not avail themselves of such provisions.

### E. Defendants' Fraudulent Scheme

64. SFS has created a complex but highly successful business model that works hard at minimizing the visible risk that led to Legal Helpers' downfall while maintaining the same highly successful fraudulent premise that impoverished thousands of Legal Helpers' clients.

65.     Visitors to SFS' website see a website light on specifics as to what it actually does. The clearest statement on its website states that, "Strategic Financial Solutions operates several independent products offering loans, debt relief programs, and budgeting tools for consumers hoping to improve their financial health and wellness."[17]

66.     SFS also spends significant time pursuing positive press to obscure the fraud that lies at the heart of the company, focusing on stories of employees pursuing dreams,[18] financial empowerment to its victims,[19] and gender equity[20] (among other areas of self-congratulation) while only lightly describing the work that actually makes up the core of its business.

67.     However, behind these innocuous statements, SFS is a large and growing company dedicated to defrauding tens of thousands of victims into believing that they are purchasing legal debt relief services when, in fact, they are not.

68.     Further, SFS has been sued repeatedly in state and federal court for this scheme since its founding, but continues to operate today as it has for over a decade.[21]

69.     To begin, SFS sends out letters and mailers to thousands of people every week that it has determined, via "soft" credit inquiries, have very high levels of consumer debt. *See* Exhibit A., Letter from "Polo Funding" to Julia Briggs.

---

[17] https://stratfs.com/ (last accessed July 15, 2022).
[18] *See* https://buffalonews.com/business/local/strategic-financial-solutions-makes-its-mark-in-amherst/article_94a0b61a-bc1c-50fa-aa22-b6a0a4c64acc.html (last accessed July 15, 2022).
[19] *See* https://www.prweb.com/releases/firstly_launches_new_family_financial_wellness_content_platform/prweb18022786.htm (last accessed July 15, 2022).
[20] *See* https://www.prweb.com/releases/the_top_100_women_leaders_in_finance_of_2021/prweb18260557.htm (last accessed July 15, 2022).
[21] *See, e.g., Hughes et al. v. Strategic Financial Solutions LLC et al.*, Case No. 3:20-cv-1096, D. Conn.; *Lemieux v. Strategic Financial Solutions LLC et al.*, Case No. 3:20-cv-741, D. Conn.; *Barkley v. Global Client Solutions, LLC et al.*, Case No. 1::20-ap-1034, Bankr. Ct. D. Miss.; *Johnson v. Strategic Financial Solutions, LLC et al.*, Case No. 05-2019-CA-057725-XXXX-XX, Cir. Ct. Brevard Cty., Florida, and relatedly, *Jones v. Strategic Financial Solutions LLC et al.*, Case No. 1:16-cv-4617, SD.N.Y.

70.     These mailers purport to help you "fix" for "once and for all" your "mountain of high-interest credit card debt and crushing monthly payments."[22]

71.     These letters and mailers use fictitious entities designed to look like actual companies that offer debt relief through loans to consumers.  SFS generates these entities internally and designs them to look like individual companies, even though none are registered as businesses. New fictitious names are introduced every few weeks.

72.     A partial, and incomplete list of these include the following:

Polo Funding (https://www.polofunding.com/, last accessed July 18, 2022)

Braidwood Capital (https://www.braidwoodcapital.com/, last accessed July 18, 2022)

Dune Ventures (https://www.duneventures.com/, last accessed July 18, 2022)

Tiffany Funding (https://www.tiffanyfunding.com/, last accessed Juy 18, 2022)

Nickel Advisors (https://www.nickeladvisors.com/, last accessed July 18, 2022)

Hornet Partners (https://www.hornetpartners.com/, last accessed July 18, 2022

Coral Funding (https://www.coralfunding.com/, last accessed July 18, 2022)

Polk Partners (https://www.polkpartners.com/, last accessed July 18, 2022)

Corey Advisors (https://www.coreyadvisors.com/, last accessed July 18, 2022)

Also, Pennon Partners, Cobalt Advisors, Colony Associates, Glider Lending, Ladder Advisors, Jayhawk Advisors, Great Lake Associates [sic], Pine Advisors, Alamo Associates, Punch Associates, White Mountain Partners, Steele Advisors, Grand Canyon, Advisors, Glider Lending, Lucky Marketing, Golden State Partners, Pine Advisors, Derby Advisors, Graylock Advisors, Tuck Associates, Punch Associates, Keel Associates, Ballast Associates, Tweed Lending, Concourse Lending, Graphite Funding, August Funding, Broadstar Financial, Salvation

---

[22] *Id.*

Funding, Stallion Lending, Pebblestone Financial, Sussex Funding, Lafayette Funding, Guardian Angel Funding, and Bridgeline Funding among others.

73.     There are dozens, if not hundreds, of these websites designed and used by SFS in the course of their scheme.

74.     The associated websites are all extremely similar.  They use similar designs with stock photos, and have virtually identical language in areas like the Privacy Policy and disclosures.

75.     According to CI1, once any one website appears in a certain volume of search engine results, SFS has observed a pattern where the site begins to be listed by fraud warning sites and services, at which point it becomes a liability rather than an asset.[23]  According to CI1, for this reason, the websites and entities are rotated out in favor of new ones, which SFS creates in batches every two to four weeks.  No language on the website indicates that they have any relation to any outside entity.  All contact information goes to a P.O Box (unique to each website), a single, unique email address, or a 1-800 number (also unique to each website).

76.     Once a potential client calls or fills out an online form for one of these fictitious entities, an SFS call center employee (who is not an attorney), identifying him or herself as being from SFS wholly-owned subsidiary Versara will call the potential client back and, working from a script, will attempt to sign up the potential client for one of two types of debt relief service.

77.     CI1 relates that if the potential client wishes to sign up, SFS primarily offers one of two types of debt relief programs (referred to *infra* as "buckets"): a traditional, contingency-based debt relief program (the "contingency bucket") or an attorney-based program (the "attorney bucket").

---

[23] For example, *see* https://crixeo.com/debt-consolidation/polo-funding-review/ (last accessed July 15, 2022) and https://www.scampulse.com/polo-funding-reviews (last accessed July 15, 2022).

78.     SFS does sign some consumers up for the contingency bucket, and those clients are not the subject of this lawsuit.

79.     CI1 relates that the call center workers are trained to use a script that steers clients wherever possible to the attorney bucket, because these clients can be billed regularly without regard to any actual debt reduction result.

80.     The reason for maximizing the number of clients in the attorney bucket is that most states strictly limit the amounts that debt relief companies can charge.  For example, in Illinois, a debt relief company may charge no more than 15% of the value of the debt saved as a fee to the client.[24]

81.     Further, these fees must be taken on a contingency basis, and they may not be charged to the client until debt relief has been successfully negotiated.[25]

82.     However, as stated above, attorneys are exempted from many debt relief rules and laws, and they are not typically bound by the value-percentage limits of traditional debt relief companies.[26] An attorney negotiating a client's debts can bill hourly or monthly.  However, here, all negotiation was performed by nonlawyers at SFS with no meaningful supervision or involvement from the Affiliate firms.  The clients were assessed fees monthly for work that non-lawyers did, and almost without exception were assessed fees several times the amount of SFS could lawfully charge for non-attorney debt relief services.

83.     For example, one lawsuit against SFS alleges that a plaintiff's total debts were $40,723 at the time that the plaintiff retained an SFS-controlled Affiliate law firm.  During the

---

[24] 225 ILCS 429/125(c).
[25] *Id.*
[26] 225 ILCS 429/10

course of the law firm's purported representation, SFS charged the client $29,724.17 in fees, nearly 73% of the total balance of fees, while resolving no actual debts.[27]

84.    CI1 relates that once a potential client agrees over the phone to sign up for the attorney bucket, SFS, and not the Affiliate firm, dispatches a local, contracted notary public to go to the client in person and sign a retainer agreement.

85.    These purported retainer agreements are between the Affiliate law firm (such as Monarch) and the client.  Because negotiators for SFS, Versara, nor any of SFS's other subsidiaries are lawyers or law firms and cannot provide legal services, the retainer does not disclose their existence, even though SFS bills the client, keeps most of the money, and does all or substantially all of the work unsupervised.

86.    According to CI1, the purported retainer agreements are prepared by SFS, and provided to the Affiliate firms.

87.    As has been noted in other lawsuits, the purported retainer agreements between clients and the Affiliate firms are all extremely similar and utilize similar language.[28]

88.    According to CI1, the notaries are paid for by SFS, instructed by SFS personnel in the signup process, and dispatched to sign up the client, paid by SFS.   However, at no point do the notaries or the Affiliate firm disclose the role of SFS or its subsidiaries.

89.    Further, as described in attorney disciplinary proceedings *infra*, the notaries are instructed to explain legal rights and obligations to the potential clients without the oversight, involvement, or even the awareness of any of the Affiliate firms' lawyers in violation of the rules of professional conduct of several states, as further discussed *infra*.

---

[27] *See Lemieux v. Strategic Financial Solutions, LLC et al.*, Case No. 3:20-cv-741, D. Conn., filed May 29, 2020, Second Corrected Complaint (ECF No. 10) at ¶¶ 19-20, 25.
[28] *See, e.g., Johnson v. Strategic Financial Solutions, LLC et al.*, Case No. 05-2019-CA-057725-XXXX-XX, Cir. Ct. Brevard Cty., Florida.  Dkt. No. 1 at ¶ 99.

90.     Once "retained," clients are required to grant access to their bank accounts for direct monthly ACH withdrawals, which include not only a standard monthly fee, but numerous other fees, both one-time and recurring. This access is granted to the third party payment processor before the attorney conversation takes place with the Affiliate firm.  Neither SFS nor the Affiliate firm are identified in the withdrawal information on the client's banks statement, only the third party payment processor.

91.     The monthly withdrawals are received by a payment processor, typically RAM Payment, LLC, or Global Client Solutions, LLC and then distributed to SFS and the Affiliate law firms.

92.     RAM Payment, LLC regularly serves as a payment processor to debt relief and debt consolidation organizations and has been sued more than once for its role in facilitating illegal payments for debt relief companies.

93.     CI1 relates that SFS employees also instruct the clients on calls, again as part of a script, to ignore all communications from creditors, telling clients that creditors need to be desperate to collect in order to make better deals.

94.     As part of these instructions, SFS also informs clients via calls that they may be sued by their creditors, but if they are, to do nothing except pass the complaint to Affiliate firm. Again, these instructions take place without the direct knowledge, supervision, or involvement of the attorneys at the Affiliate firms.

95.     The sole contact that the client will then have with the Affiliate law firm is a single introductory phone call or teleconference from the Affiliate law firm who, when calling the client, identifies him or herself as an attorney with the Affiliate law firm who represents that he or she will be negotiating debts on behalf of the client.

96.     After that phone call, SFS will then handle all aspects of the relationship with the client.

97.     According to CI1 and the state disciplinary findings discussed further *infra*, clients are not provided the ability to call their attorneys directly.  Telephone numbers provided to clients for the Affiliate law firms (as well as the publicly available telephone numbers for the Affiliate law firms) ring directly through to SFS in New York.  The calls are answered by SFS's non-lawyer staff who identify themselves in such a way that leads clients to believe they are talking to an Affiliate law firm employee.

98.     As one Glassdoor review from a former employee states, "It's pretty much a scam. Dealing with the customers is a nightmare. Answer the phone as any of 10 different law firms and fake it till you make it through the conversation."[29]

99.     Upon investigation, no matter what time zone the Affiliate law firm is based in, all Affiliate law firm phone numbers keep the same Eastern time zone hours, and many, if not most, have the same after hours answering message on their answering service.  Further, calls to different Affiliate law firms in different parts of the country feature the same, distinctive hold music, "Hold On I'm Coming" by Sam & Dave.

100.    Mail sent to the Affiliate law firm address on the purported retainer agreement or website goes to a maildrop at a virtual workspace. The mail is scanned and uploaded into the SFS computer system before it is given to the relevant Affiliate law firm.

101.    Because SFS and the Affiliate firms bill monthly, the client's monthly withdrawals will continue for months, sometimes years, until the client runs out of funds or terminates the

---

[29] https://www.glassdoor.com/Reviews/Strategic-Financial-Solutions-Reviews-E1027494_P4.htm?sort.sortType=OR&sort.ascending=true&filter.iso3Language=eng (last accessed July 15, 2022)

relationship.  This is uniformly true, without regard to how much, or indeed whether any, debt reduction is achieved.  SFS has maintained this billing relationship even in instances where the Affiliate firm has contacted no creditor, no debt reduction has been achieved, and not a single document is present in the Affiliate firm file except for the purported retainer agreement.

102.    Using this business model, SFS has made millions of dollars every year since its founding.  In early 2022, SFS listed as many as 31 job openings on its website, mostly for "sales consultants" – individuals who, according to CI1, both handle customer sign-up, and then are delegated to speak to the clients as though they worked for the various Affiliate law firms.  These are high-pressure commission-based jobs with high turnover levels.

103.    Additionally, in July 2020 it was reported that SFS had approximately 500 employees, but was looking to expand to up to 1,500 employees.[30]

104.    SFS represents on its own website that it has had more than 100,000 clients since its founding.[31]

105.    Examination of the public biographies of SFS personnel make clear that SFS employees do in fact do all the work for the Affiliate firms.  For example, an employee of SFS, Billy Palmer, lists his job title as "full time Debt negotiator for Strategic Financial Solutions."  Mr. Palmer's LinkedIn profile states that he works on the "Monarch Legal Group Portfolio."  See Billy Palmer's Linkedin profile, attached hereto as Exhibit B.

106.    Mr. Palmer has worked as a Debt Negotiator for SFS since May 2021.  Mr. Palmer is not a licensed attorney, and does not even have a bachelor's degree, much less a juris doctor.

---

[30] *See* https://buffalonews.com/business/local/strategic-financial-solutions-makes-its-mark-in-amherst/article_94a0b61a-bc1c-50fa-aa22-b6a0a4c64acc.html (last accessed July 15, 2022)

[31] "Since Strategic was founded over thirteen years ago, we have used this unique approach to successfully fund loans and resolve more than $1 billion in debt for more than 100,000 clients across the United States.", https://stratfs.com/ (last accessed July 15, 2022).

107.    Despite not being a licensed attorney and despite not being under the supervision of Monarch or any attorney thereof, Mr. Palmer and similar employees of SFS negotiate debt directly on behalf of Monarch clients.  These clients are led to believe, and most importantly billed as though their debt is being negotiated by an Affiliate law firm and not a call center worker.

108.    Mr. Palmer's position is typical of employees at SFS who directly negotiate the debt of clients.  CI1 has identified positions such as Mr. Palmer's as being commonplace and routine.

109.    Billing in this way for debt negotiation, even while having non-attorney call center workers do any negotiation without supervision from the Affiliate firm, is fundamental to SFS's business model, despite it never being revealed in the Affiliate firm contract with the clients. SFS depends on maintaining a large supply of client bank accounts in order to collect substantial monthly revenues, and could not do so if it billed only on the basis of a percentage of reduction achieved.  It also depends on clients believing they are retaining the services of a law firm when, in fact, SFS handles all substantive aspects of the client "relationship".

**F.   The Affiliate Law Firms**

110.    Using platforms like Craigslist, SFS recruits attorneys to set up Affiliate law firms.

111.    According to CI1, SFS works with these attorneys to establish these firms.  The Affiliate law firms are typically one or two attorneys who "do business as" with other names.  In the case of Monarch, Monarch's actual name is Burnette Legal Group, though "Burnette Legal Group" is listed nowhere on Monarch's website.  The websites list only the name or address of the attorney or firm only where required by state law.[32]

---

[32] The closest Monarch's website gets to identifying its actual name is to note "An attorney responsible for the content of this Site is Timothy Burnette licensed in Illinois with offices at 211 W. Wacker Dr. #321, Chicago, IL 60606." (https://www.monarchlegalgroup.com/, last accessed July 15, 2022).

112.    All other Affiliate law firms give similarly anodyne d/b/a names.  Upon review, most of these entity names do not include the name of any attorney in the management of the firm. These include, but are not limited to, A. Florio & Associates PLLC d/b/a Bedrock Legal; Anchor Law Firm PLLC; Boulder Legal Group, LLC, Canyon Legal Group, LLC; Carolina Legal Services (now defunct, see *infra*); Chinn Legal Group, LLC d/b/a Slate Legal Group; Colonial Law Group, LLC; The Commonwealth Law Group, PLLC; Credit Advocates Law Firm, LLC (apparently now defunct); Donald Norris Associates PLLC d/b/a Stonepoint Legal Group; Frontier Consumer Law Group, LLC; Gardner Legal, LLC d/b/a Option 1 Legal; Great Lakes Law Firm, LLC; Golden Law LLP; Hailstone Legal Group, LLC; Harbor Legal Group, LLC[33]; Heiser Legal Group LLC d/b/a Glacier Bay Law; Henry Legal Group, LLP d/b/a Heartland Legal Group (now inactive); Hinds Law, LLC d/b/a First America Law LLC (possibly now defunct);  The Law Offices of Arne Skatrud & Associates d/b/a The Cornerstone Legal Group LLC; Newport Legal Group[34]; Northstar Legal Group LLC; Phoenix Legal Group, PLLC; Pioneer Law Firm, P.C.; Rockwell Legal Group; Royal Legal Group, LLC; Strong Law Group, LLC; The Sands Law Group, LLC d/b/a Whitestome

---

[33] At the time of this writing, the website for Harbor Legal Group and the Colorado Secretary of State recognize G. Anthony Yuthas as the agent and responsible attorney for this site.  Mr. Yuthas died on November 12, 2021 (https://www.horancares.com/obituary/GAnthony-Yuthas).  However, calls placed to Harbor Legal's posted phone number on June 23, 2022 were answered and a person identifying herself as "Harbor Legal" and stated that they were attorneys with G. Anthony Yuthas and still eligible to assist with debt relief in Colorado.

[34] "Newport Legal Group" (https://www.newportlegalgroup.com/) appears to be a d/b/a, and is not a registered company with the State of Massachusetts as of this writing.  The managing attorney, Taylor A. Greene does not list his firm affiliation with the Massachusetts Board of Bar Overseers and his LinkedIn page (https://www.linkedin.com/in/taylor-greene-223194127/) lists him as the principal of Taylor A. Greene Law, which is also not a registered business with the State of Massachusetts.

Legal Group[35]; Spring Law Group[36]; Stevens & Associates PLLC d/b/a Regency Legal Group; Watson Law LLC d/b/a Corporate Legal Network LLC; and Wyolaw, LLC[37].

113.    CI1 relates that SFS works with attorneys who are the principals for these law firms to set up websites and marketing materials for the Affiliate law firms.  Many are maintained via WordPress blogs.

114.    Monarch's website, for example, states that "[w]ith debt settlement, you will work with your creditor to negotiate your debts down to an amount you can afford. You can settle most kinds of unsecured debts, including credit cards, personal loans, medical bills and more. The process can be complex, but you don't have to go it alone. Monarch Legal Group has extensive experience in the debt settlement process, and we will work directly with your creditors to negotiate fair amounts, often for pennies on the dollar. Once we've negotiated a settlement and you've approved it, you'll be well on your way to a future free of burdensome debt."[38]

115.    This statement is misleading in the absence of any disclosure of the role of SFS. Monarch does not disclose that SFS's payment processor withdraws fees from the client's bank, that SFS receives a share of that fee that is not tied to the success of debt reduction, that communications by phone or mail with Monarch are routed through SFS, or that nonlawyers in

---

[35] Whitestone Legal Group (https://www.whitestonelegalgroup.com/) is not a registered business with the State of Hawaii, though the managing attorney, Thomas D. Sands, is the principal of The Sands Law Group, APLC.  The Sands Law Group, as of this writing, is not in good standing with the State of Hawaii and Thomas D. Sands has been suspended from the practice of law for disciplinary reasons.  The suspension appears unrelated to the events giving rise to this Complaint (*See* https://dbhawaii.org/wp-content/uploads/211222-Order-of-Suspension-of-Thomas-D.-Sands-SCAD-21-0000582-1.pdf)

[36] Spring Law Group (https://www.springlegalgroup.com/) is not a registered business with the State of Georgia, though the managing attorney, Melissa Michel, appears to practice through The Michel Law Firm LLC, which is a registered business in Georgia.

[37] WyoLaw is an active registered business with the State of Wyoming but does not list any Wyoming attorneys on its website (or, indeed, any attorneys whatsoever as of this writing).  Papers filed with the Wyoming Secretary of State identify Timothy Burnette, sole member of Monarch, and Guillermo Geisse, a California attorney whose LinkedIn page identifies him as having worked as an attorney at Legal Helpers from 1998 to 2013 (https://www.linkedin.com/in/guillermo-geisse-b547b63b/) as agents or signators of WyoLaw.  Neither is licensed in Wyoming according to the Wyoming State Bar's website.

[38] https://www.monarchlegalgroup.com/debt-negotiation/ (last accessed July 15, 2022)

SFS's call center will communicate directly with creditors and without attorney oversight or even attorney contact. In the absence of these disclosures, clients are receiving misleading communications that are material to the decision to use a law firm (permitted to bill monthly) instead of a non-attorney debt reduction service (permitted to bill only contingent upon actual reduction).

116. Monarch's website also states that, "Monarch Legal Group understands the stress that comes from debt collectors. We can help stop the creditor harassment, protect your legal rights and help you manage your debt."[39] These statements are also misleading in the absence of disclosure of SFS's role in actually negotiating the debts with creditors.

117. In return, the Affiliate law firms receive an initial payment from SFS (according to CI1, routinely $500) to accept the "representation" and make the initial call, as well as a fixed percentage of the client's monthly ACH withdrawals (according to CI1, approximately 5-10%, though Daniel Rufty's Consent Order of Discipline (discussed further infra, and attached hereto as Exhibit C) reports his percentage as 3%). Under most, if not all situations, SFS pockets the vast majority of the fees collected by people who use the attorney bucket.

118. According to CI1, there is no expectation from either SFS or the Affiliate law firm that the Affiliate law firm will undertake any additional representation on the part of the client. At this point, the Affiliate law firm's sole purpose is to maintain the fiction and appearance that SFS's work (or lack thereof) is being done by the Affiliate firm.

**G. The North Carolina State Bar Takes Action Against The Conspiracy**

119. On April 8, 2021, The Disciplinary Hearing Commission of The North Carolina State Bar (the "DHC") made several findings of fact and entered a consent order of discipline

---

[39] *Id.*

against Daniel Rufty, who had until that time, been the managing member of Carolina Legal Services ("CLS"), an Affiliate firm listed in ¶ 102. *See The North Carolina State Bar v. Daniel S. Rufty*, Case No. 20 DHC 17, Ex. C.

120.     The DHC found that an Illinois attorney, Jason Blust,[40] had started or helped to start law firms in several states "with the goal of convincing debtors struggling to pay their bills to hire one of the Blust Law Firms to negotiate reduced payoff amounts with the debtor's creditors."[41]

121.     The DHC found that "[t]he Blust Law Firms [including Carolina Legal Services] are engaged in the unauthorized practice of law and debt adjusting in multiple states."[42]

122.     The DHC noted that the Blust Law Firms "largely work with the same entities and individuals," including Defendant SFS, Global Client Solutions (referenced *supra* in ¶ 82), and Ryan Sasson, CEO of SFS.[43]

123.     The DHC found that Jason Blust started Carolina Legal Services, decided its operations, and established its relationships, including those with SFS and Ryan Sasson.[44]

124.     The DHC further found that Blust hired Rufty the same year Rufty graduated from law school, while Rufty had limited experience in the practice of law. Blust then arranged for Rufty to be the majority member of Carolina Legal Services.[45]

125.     The DHC found that while Rufty was the majority member of Carolina Legal Services, he distributed 97% of the profits to Blust and another attorney as "consulting fees"[46]

---

[40] Jason Blust is an alum of Legal Helpers. *See* https://radaris.com/f/Jason/Blust/Lawyer (last accessed June 28, 2022)  According to the *Johnson* Complaint, referenced *supra*, Blust was a partner at Legal Helpers. *See Johnson* Compl. at ¶ 35.
[41] *Id.* at ¶ 6.
[42] *Id.* at ¶¶ 7,9.
[43] *Id.* at ¶ 8.
[44] *Id.* at ¶11.
[45] *Id.* at ¶¶12-14.
[46] *Id.* at ¶ 14.

126.   The DHC found that customers who contacted Carolina Legal Services were put directly in contact with nonlawyers at SFS in New York to discuss their debts and legal issues.[47]

127.   The DHC found that Blust, Sasson, and "others at Strategic Financial Solutions" were in charge of the nonlawyers at SFS and routinely told them how to manage cases.[48]

128.   The DHC found that nonlawyers at SFS enrolled clients into Carolina Legal Services without Defendant's involvement.[49]

129.   The DHC found that, among other things, SFS directly advised clients to stop paying creditors, thereby providing clients with legal advice.[50]

130.   The DHC found that SFS, unsupervised by Rufty, hired local nonlawyer notaries to go to clients' houses alone and without a lawyer present, to walk the client through the process of signing the contracts and setting up ACH drafts to Client Legal Solutions' accounts.[51]

131.   The DHC was at pains to point out that Rufty and Carolina Legal Services did not hire the nonlawyer notaries nor did they ever speak with them or determine how the nonlawyer notaries would be paid.[52]

132.   The DHC was further at pains to note that SFS then answered client questions directly throughout the duration of the relationship with the clients while Rufty never hired, paid, directed, reviewed communications, or even generally ever spoke to the SFS nonlawyer employees.[53]

---

[47] *Id.* at ¶ 22.
[48] *Id.* at ¶ 23.
[49] *Id.* at ¶ 24.
[50] *Id.* at ¶¶ 25-26.
[51] *Id.* at ¶¶ 27-28.
[52] *Id.* at ¶¶ 30-33.
[53] *Id.* at ¶¶ 34-41.

133. The DHC specifically found that SFS's "nonlawyers answered questions posed by Defendant [Rufty]'s [Carolina Legal Services] clients throughout CLS's representation of the clients, even when his CLS clients specifically asked to speak with a lawyer."[54]

134. Further, the DHC found that SFS's "nonlawyers provided legal advice to Defendant [Rufty]'s CLS clients about how to handle their legal situations, when and how to file pleadings in some cases, and when and to what extent to stop paying their bills."[55]

135. The DHC further found that Rufty "permitted these nonlawyers to negotiate the resolution of his CLS clients' litigation, which is a legal service in North Carolina."[56]

136. The DHC found that both Rufty and SFS nonlawyers falsely indicated to clients that "a lawyer would always be available to answer the clients' questions." In fact, lawyers were seldom, if ever, available to answer questions.[57]

137. Additionally, the DHC found that Rufty and SFS nonlawyers falsely indicated to clients that "all legal services provided by the firm would be provided by licensed attorneys."[58]

138. The DHC also found that CLS client funds were entrusted clients funds and were thus improperly handled by directly being paid to Global Client Solutions, which is not an eligible bank under North Carolina law. As a result, entrusted funds were mishandled under the North Carolina Rule of Professional Conduct 1.15[59]

---

[54] *Id.* at ¶ 43.
[55] *Id.* at ¶ 45.
[56] *Id.* at ¶ 50.
[57] *Id.* at ¶¶ 51-53.
[58] *Id.* at ¶¶ 54-56.
[59] *Id.* at ¶¶ 60-72.

139. The DHC also found that Rufty rarely, if ever, spoke to his clients and failed to keep them apprised of the status of their cases. Many of Rufty's clients had never spoken with him at all. Many of Rufty's clients had no way of contacting him, only SFS.[60]

140. The DHC also found that when Rufty's clients were sued by creditors, he routinely failed to appear or file responsive pleadings.[61]

141. The DHC described Rufty's conduct as "a total abdication of his responsibility[ies]."[62]

142. The DHC suspended Rufty's law license for five years, a suspension which continues to be in effect as of this writing.

143. The actions the DHC describes in its Order track very closely the experience of Plaintiff Briggs.

### H. Laws and Regulations Relating to Debt Relief in Illinois

144. The Affiliate firms serve the purpose of allowing SFS to bill clients monthly for the efforts of non-lawyers when federal and state laws prohibit this.

145. Under the Illinois Debt Settlement Consumer Protection Act (the "IDSCPA"), a Debt settlement provider is defined as "(1) any person or entity engaging in, or holding itself out as engaging in, the business of providing debt settlement service in exchange for any fee or compensation; (2) any person who solicits for or acts on behalf of any person or entity engaging in, or holding itself out as engaging in, the business of providing debt settlement service in exchange for any fee or compensation; (3) any person or entity engaging in, or holding itself out as engaging in the business of student loan debt relief services in exchange for any fee or

---

[60] *Id.* at ¶¶ 75-79.
[61] *Id.* at ¶¶ 80-81.
[62] *Id.* at ¶ 82.

compensation assessed against or charged to a consumer; or (4) any person who solicits for or acts on behalf of such person or entity engaging in or holding itself out as engaging in, the business of student loan debt relief services in exchange for any fee or compensation assessed against or charged to a consumer." *See* 225 ILCS 429/10.

146.     Under this definition, SFS is a debt settlement provider.

147.     The IDSCPA forbids the charging of any enrollment, maintenance, or upfront fee, with the exception of a one-time enrollment fee of not more than $50. *See* 225 ILCS 429/125(a).

148.     It is unlawful for any person or entity to provide debt settlement services to Illinois consumers without obtaining a license under the IDSCPA. *See* 225 ILCS 429/15. Additionally, it is a class 4 felony in Illinois for any person to operate as debt settlement provider without a license. *See* 225 ILCS 429/80(a).

149.     The IDSCPA provides that any contract of debt settlement service as defined in this Act made by an unlicensed person shall be null and void and of no legal effect. *See* 225 ILCS 429/80(b).

150.     As of this writing, neither SFS nor any of its subsidiaries has ever obtained a license as a debt settlement provider under the Illinois Debt Settlement Consumer Protection Act.

151.     The Illinois Debt Settlement Consumer Protection Act also requires that any debt settlement provider file an annual report with the Illinois Secretary of State that includes data on the number of Illinois residents serviced by the debt settlement provider, the status of each account, and other relevant data as to the provider's debt settlement activities. *See* 225 ILCS 429/33. As of this writing, neither SFS nor any of its subsidiaries (including Versara) has ever filed a report with the Illinois Secretary of State regarding its debt settlement activities, or with any other state entity that requires such a report.

152.    The Illinois Debt Settlement Consumer Protection Act requires that all consumer funds held in a dedicated trust account shall be used for no other purpose than paying the bills, invoices, or accounts of the debtor.  225 ILCS 429/65(b).

153.    Under the Illinois Debt Settlement Consumer Protection Act, a "debt settlement provider shall not, expressly or by implication, make any unfair or deceptive representations, or any omissions of material facts, in any of its advertising or marketing communications concerning debt settlement services.  225 ILCS 429/105(b).

154.    As related *supra*, neither SFS, nor its agents, subsidiaries, nor subcontractors have never communicated to consumers, including Plaintiff, that SFS would be doing the debt negotiation without the direct supervision of the Affiliate firms.

155.    The IDSCPA provides that "advertising and marketing communications concerning debt settlement services shall disclose the following material information clearly and conspicuously: "Debt settlement services are not appropriate for everyone. Failure to pay your monthly bills in a timely manner will result in increased balances and will harm your credit rating. Not all creditors will agree to reduce principal balance, and they may pursue collection, including lawsuits." *See* 225 ILCS 429/105(c).

156.    This disclosure was never made in any advertisements made to solicit consumers for SFS's debt settlement services.  Upon review of the Affiliate Firms, in states where such a disclosure is required, this disclosure is absent.

157.    Additionally the IDSCPA provides that certain disclosures have to made to consumers before a contract is signed, including that Debt settlement services may not be suitable for all consumers; using a debt settlement service likely will harm the consumer's credit history and credit score; the consumer remains obligated to make periodic or scheduled payments to

creditors while participating in a debt settlement plan, and that the debt settlement provider will not make any periodic or scheduled payments to creditors on behalf of the consumer; and other disclaimers. *See* 225 ILCS 429/115(a).

158. SFS never made all of the necessary disclaimers under 225 ILCS 429/115(a).

159. Further, 225 ILCS 429/140 requires that debt settlement providers shall act in good faith in all matters under this Act.

160. By concealing SFS's involvement in the debt negotiation from the consumers, SFS and its Affiliate law firms have not acted in good faith towards the consumers of their services.

## CLASS ALLEGATIONS

161. Plaintiff brings this case as a class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the below-defined Classes:

**Multistate Class:** All persons in the United States who entered into purported retainer agreements with Affiliate Firms and paid with initial and/or monthly fees rather than contingent fees in states where monthly fees are impermissible for non-attorney debt relief companies and in which SFS maintains an Affiliate firm. At the time of this writing, Plaintiff understands these states to be Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Kansas; Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Tennessee, Texas, Wisconsin, and Wyoming. Plaintiff reserves the right to amend the definition of the Multistate Class should further investigation bring additional facts to light including, but not limited to, the existence of additional Affiliate firms of which Plaintiff is not currently aware.

**Illinois Subclass:** All persons in Illinois who entered into purported retainer agreements with Affiliate Firms and paid with initial and/or monthly fees rather than contingent fees.

Collectively, the Multistate Class and Illinois Subclass are referred to as the "Class" or "Classes." Excluded from the Class are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Any judge and/or magistrate judge to whom this action is assigned and any members of such judges' staffs and immediate families are also excluded from the Class.

162. Plaintiff is a member of the Classes.

163. Defendant SFS has fraudulently induced thousands of people across the United States into signing up for the attorney bucket. Defendants together have fraudulently induced more than 40, and more likely hundreds or thousands of Illinois residents into signing up for the attorney bucket. As stated supra, SFS claims to have worked with approximately 100,000 clients since its founding. Accordingly, members of the Class are so numerous that their individual joinder herein is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant, third party retailers, and vendors.

164. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

  a. whether the Defendants fraudulently induced Plaintiff and Class members into signing up with Affiliate firms

  b. whether Defendants misrepresented the Affiliate firms and their work

c.  whether the Defendants misrepresented or concealed the employment of SFS call center employees

d.  whether Defendants misrepresented the nature of the work performed including whether debt reduction negotiations were conducted by attorneys at the Affiliate firms, or under their direct supervision;

e.  whether it was legally permissible for the Affiliate Firms to bill clients fixed and monthly fees (as attorneys may do and non-attorneys may not) for work done by SFS call center employees not under the supervision of Affiliate firm lawyers.

165.  The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendants' false, misleading, and misbranded advertisements and inducements; the named Plaintiff was fraudulently induced to pay for Defendants' unlawful services; the named Plaintiff overpaid for Defendants' services in a way not permissible by law; and Defendants unjustly retained the benefit of the named Plaintiff in the same manner as the Class as a whole.

166.  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

167.  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liabilities. Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liabilities. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

<u>**EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS**</u>

168. Plaintiff, on behalf of the Class, disclaims any burden to plead facts regarding the statute of limitations. By its very nature, as alleged herein, Defendants' unlawful activity was self-concealing. By Defendants' affirmative acts, misrepresentations, and nondisclosures, any applicable statute of limitations on claims asserted by Plaintiff and members of the Class have been and are tolled.

169. Further, Defendants' conduct continues to this day. These actions continued the conduct complained of through the filing of this complaint.

170. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until at least November 5, 2021. In the exercise of reasonable diligence, Plaintiff could not have discovered Defendants' violations of law such that suit could be brought before November 5, 2021.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Fraud**
**By Plaintiff Against All Defendants Individually and on Behalf of the Multistate Class**

171. Plaintiff repeats the allegations contained in paragraph 1-170 above as if fully set forth herein.

172.    Plaintiff brings this claim individually and on behalf of the members of the Multistate Class against Defendants.

173.    Defendants made pervasive and consistent representations regarding the nature of the purported attorney services provided to Plaintiff and Class Members, including the following:

a.  SFS nonlawyer personnel referred Plaintiff and each Class Member to an Affiliate Firm without disclosing that SFS would share in, and in fact take the largest share of, any fees paid;

b.  A notary working at the direction of SFS presented a purported retainer letter to Plaintiff and each Class Member without disclosing that the purported retainer agreement was drafted by SFS and that the notary was hired and compensated by SFS without the direction or involvement of the Affiliate firms;

c.  The Affiliate firms failed to follow the directives of Model Rule 1.4 (where applicable) in that they did not obtain informed consent from Plaintiff and each Class Member regarding the mechanism by which Plaintiff's and each Class Member's debts would be negotiated, a matter requiring informed consent as it directly impacted the nature of the attorney-client relationship;

d.  The Affiliate firms failed to follow the directives of Model Rule 1.8 (where applicable) in that they attempted to limit their legal liability and SFS's legal liability without obtaining informed consent on the part of Plaintiff and each Class Member;

e.  SFS arranged for its payment processor to withdraw an initial and monthly fees from the Plaintiff's and each Class Member's account without disclosing that the fee would be sent to SFS and not the Affiliate firms, that SFS would keep the

overwhelming majority of the fees, or that SFS personnel would undertake debt reduction negotiations without involvement or supervision by the Affiliate firm;

f.  The Affiliate firm, at the initial (and typically only) client consultation, provided Plaintiff and each Class Member with a telephone number that purported to be a way to reach the lawyer or Affiliate firm, but in fact was not; the number would be answered only by SFS call center workers.

g.  All Defendants affirmatively represented to Plaintiff and each Class Member in writing and through telephonic communications that lawyers would be negotiating debt reduction services for Plaintiff and each Class Member when, in fact, non-lawyers working for SFS and without attorney involvement or supervision would be negotiating such debt reduction; and

h.  All Defendants omitted to advise Plaintiff and each Class Member that, although the client was being billed an up-front and monthly fee, this billing structure was (i) impermissible for the non-lawyer services that all Defendants understood would be provided, and (ii) were disadvantageous to the Plaintiff and each Class Member, in that a contingent billing arrangement which was permissible for non-lawyer debt relief would cost less for the same services.

174.  These omissions and misrepresentations created the impression that the work done on behalf of Plaintiff and each Class Member to relieve debt and/or repair credit would be done by licensed attorneys, or under the direct supervision of licensed attorneys.  The omissions and misrepresentations created this false impression so that Defendants could charge far higher fees (and charge them earlier in the course of purported representation) than could lawfully be charged for debt relief services undertaken by non-attorneys.

175.    As detailed above, Defendants also made misrepresentations through flyers and websites as to the nature of the entities engaging in the sale of these purported services through the use of fictitious organizations that would offer debt relief and/or credit repair to Plaintiff and Class Members.

176.    Defendants knowingly, willfully, fraudulently, and/or recklessly concealed and suppressed material facts regarding the nature of the purported attorney services sold to Plaintiff and Class Members.

177.    These concealed, suppressed facts were material because a reasonable consumer would have expected that they were receiving attorney work as stated in the purported retainer agreements provided to Plaintiff and Class Members as well as through the websites managed by Monarch and similar Affiliate law firms.

178.    A reasonable consumer would rely on those facts in deciding whether to purchase attorney services in the course of seeking debt relief and/or credit repair.

179.    Plaintiff and Class Members did not know that they were not receiving attorney work in exchange for monthly payments. Plaintiff and Class Members could not have discovered these concealed facts through reasonably diligent investigation.

180.    Defendants have a duty to disclose the truth regarding the true nature of their services. This duty arose from the fact that Defendants:

    a.    Had exclusive and/or far superior knowledge and access to the material, suppressed facts regarding the attorney services and lack thereof;

    b.    Affirmatively and intentionally concealed the material facts from Plaintiff and Class Members; and

    c.    Knew that these facts would affect Plaintiff's and Class Members' decisions to buy

attorney services for debt relief and/or credit repair.

181.    Each Plaintiff decided to purchase attorney services in debt relief and/or credit repair based in part on Defendants' explicit and implicit representations as to the nature of their work.

182.    Defendants' omissions of material facts were made to Plaintiff and Class Members when they purchased the purported attorney services.

183.    Defendants intended that their omissions of material fact would deceive or mislead Plaintiff and Class Members, and induce them to purchase purported attorney services.

184.    Plaintiff and Class Members justifiably relied on Defendants' misrepresentations and omissions of material facts regarding the attorney services, as described *supra*.

185.    Defendants' misrepresentations and omissions of material facts directly and proximately caused the damages suffered by Plaintiff and Class Members. As a result of Defendants' omissions of material facts, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

186.    Defendants' conduct showed malice, motive, and a reckless disregard of the truth such that an award of punitive damages is appropriate.

## SECOND CLAIM FOR RELIEF
### Violation of Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*
### By Plaintiff Against All Defendants Individually and On Behalf of the Illinois Subclass

187.    Plaintiff repeats the allegations contained in paragraph 1-170 above as if fully set forth herein.

188.    Plaintiff brings this claim individually and on behalf of the members of the Illinois Subclass against Defendants.

189.    Plaintiff and members of the Illinois Subclass are "persons" within the meaning of 815 ILCS 505/1(c).

190.     Defendants' purported attorney debt relief and/or credit repair services are "trade" and/or "commerce" within the meaning of 815 ILCS 505/1(f).

191.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment. . ."

192.     Defendants intended that Plaintiff and Illinois Subclass Members rely on their deceptive and misleading representations regarding the nature of their purported attorney services, including the following:

    a.  SFS nonlawyer personnel referred Plaintiff and each Illinois Subclass Member to Monarch without disclosing that SFS would share in, and in fact take the largest share of, any fees paid;

    b.  A notary working at the direction of SFS presented a purported retainer letter to Plaintiff and each Illinois Subclass Member without disclosing that the purported retainer agreement was drafted by SFS and that the notary was hired and compensated by SFS without the direction or involvement of Monarch;

    c.  Monarch failed to follow the directives of Illinois Rule of Professional Conduct 1.4 in that it did not obtain informed consent from Plaintiff and each Illinois Subclass Member regarding the mechanism by which Plaintiff's and each Illinois Subclass Member's debts would be negotiated, a matter requiring informed consent as it directly impacted the nature of the attorney-client relationship;

    d.  Monarch failed to follow the directives of Illinois Rule of Professional Conduct

1.8(h) in that they attempted to limit its legal liability and SFS's legal liability without obtaining informed consent on the part of Plaintiff and each Illinois Subclass Member;

e.  SFS arranged for its payment processor to withdraw an initial and monthly fees from the Plaintiff's and each Illinois Subclass Member's account without disclosing that the fee would be sent to SFS and not Monarch, that SFS would keep the overwhelming majority of the fees, or that SFS personnel would undertake debt reduction negotiations without involvement or supervision Monarch;

f.  Monarch, at the initial (and typically only) client consultation, provided Plaintiff and each Illinois Subclass Member with a telephone number that purported to be a way to reach the lawyer or Monarch, but in fact was not; the number would be answered only by SFS call center workers.

g.  All Defendants affirmatively represented to Plaintiff and each Illinois Subclass Member in writing and through telephonic communications that lawyers would be negotiating debt reduction services for Plaintiff and each Illinois Subclass Member when, in fact, non-lawyers working for SFS and without attorney involvement or supervision would be negotiating such debt reduction; and

h.  All Defendants omitted to advise Plaintiff and each Illinois Subclass Member that, although the client was being billed an up-front and monthly fee, this billing structure was (i) impermissible for the non-lawyer services that all Defendants understood would be provided, and (ii) were disadvantageous to the Plaintiff and each Illinois Subclass Member, in that a contingent billing arrangement which was permissible for non-lawyer debt relief would cost less for the same services.

193.     Additionally, the following violations of 225 ILCS 429/1 *et seq.*, The Illinois Debt Settlement Consumer Protection Act, are violations of the Illinois Consumer Fraud Act under 225 ILCS 429/155(a):

a.   Defendants have "expressly or by implication, ma[de] unfair or deceptive representations, or any omissions of material facts, in any of its advertising or marketing communications concerning debt settlement services" per 225 ILCS 429/105(b);

b.   Defendants have not conducted individualized financial analyses of Plaintiff and Illinois Subclass Members as required by 225 ILCS 429/110(a)(1);

c.   Defendants have not created, or if created, not provided to Plaintiff and Illinois Subclass Members, "statement[s] containing a good faith estimate of the length of time it will take to complete the debt settlement program, the total amount of debt owed to each creditor included in the debt settlement program, the total savings estimated to be necessary to complete the debt settlement program, and the monthly targeted savings amount estimated to be necessary to complete the debt settlement program" as required by 225 ILCS 429/110(a)(2);

d.   Defendants have not created, or if created, not provided to Plaintiff and Illinois Subclass Members a financial analysis that "the consumer can reasonably meet the requirements of the proposed debt settlement program, including the fees and the periodic savings amounts set forth in the savings goals; and [that] the debt settlement program is suitable for the consumer at the time the contract is to be signed" as required by 225 ILCS 429/110(b);

e.   Defendants have failed to sign, and thus execute, contracts for Plaintiff and Illinois Subclass Members as required under 225 ILCS 429/120(a);

f.   Defendants have failed to disclose the names of the debt settlement providers (namely Defendants SFS and Versara as well as Doe Defendants still to be determined) as required under 225 ILCS 429/120(c)(3);

g.   Defendants have failed to provide to Plaintiff and Illinois Subclass Members a good faith estimate of all fees and compensation to Defendants as required under 225 ILCS 429/120(c)(9);

h.   Defendants have failed to provide proposed savings goals to Plaintiff and Illinois Subclass Members as required under 225 ILCS 429/120(c)(10);

i.   Defendants have failed to provide "amount of money or the percentage of debt the consumer must accumulate before a settlement offer will be made to each of the consumer's creditors" to Plaintiff and Illinois Subclass Members as required under 225 ILCS 429/120(c)(11);

j.   Defendants have charged fees beyond those permitted under 225 ILCS 429/125(a);

k.   Defendants have charged up-front and/or additional fees beyond those permitted under 225 ILCS 429/125(b);

l.   Defendants have charged settlement fees in excess of those permitted under 225 ILCS 429/125(c);

m.   Defendants have charged settlement fees in excess of those permitted under 225 ILCS 429/125(d);

n.   Defendants have created demand drafts of the bank accounts of Plaintiff and the Illinois Subclass in violation of 225 ILCS 429/130(b);

o.  Defendants have failed to provide to Plaintiff and Illinois Subclass Members monthly account statements in violation of 225 ILCS 429/130(c);

p.  Defendants have failed to provide to Plaintiff and Illinois Subclass Members all fees as required under 225 ILCS 429/135(b);

q.  Defendants have failed to provide timely notice to creditors of the cancelling of debt settlement accounts as required under 225 ILCS 429/135(d);

r.  Defendants have failed to act in good faith as required under 225 ILCS 429/140;

s.  Defendants have charged fees to Plaintiff and Illinois Class Members in excess of those permitted under 225 ILCS 429/145(1);

t.  Defendants have advised Plaintiff and Illinois Class Members expressly and/or by implication to cease making payments to creditors in violation of 225 ILCS 429/145(2);

u.  Defendants have advised Plaintiff and Illinois Class Members expressly and/or by implication to cease communicating with creditors in violation of 225 ILCS 429/145(3);

v.  Defendants have advertised, displayed, distributed, and/or broadcast services containing false, misleading, and/or deceptive statements in violation of 225 ILCS 429/145(8);

w.  Defendants have entered into contracts with Plaintiff and Members of the Illinois Subclass in without making required disclosures as required by 225 ILCS 429/145(12);

x.  Defendant SFS has drafted agreements for execution between Plaintiff and Members of the Illinois Subclass that do not include required disclosures, caused

those contracts to be executed through its agents, and received funds pursuant to those contracts;

y.  Defendants have employed unfair, unconscionable, and/or deceptive acts or practices, including the knowing omissions in violation of 225 ILCS 429/145(17);

z.  Defendants have represented to Plaintiff and Illinois Subclass Members that persons participating in or considering debt settlement that purchase of any ancillary goods or services is required in violation of 225 ILCS 429/145(19); and

aa. Defendants have attempted and/or purported to obtain waivers of the Illinois Debt Settlement Consumer Protection Act from Plaintiff and Illinois Subclass Members in violation of 225 ILCS 429/150(b).

194.    As a result of Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Classes sustained actual damages in an amount to be proven at trial.

195.    Plaintiff and Members of the Illinois Subclass, pursuant to 815 ILCS 505/10a, seek actual damages, punitive damages, and reasonable attorney's fees and costs, as well as any other such relief that this Court deems appropriate.

196.    Additionally, pursuant to 225 ILCS 429/100 *et seq.* and 815 ILCS 505/10a(c), Plaintiff and Members of the Illinois Subclass seek a declaration that all purported contracts with Defendants are null and void.

197.    Pursuant to 815/ILCS 505/10a(d), a copy of this complaint is being mailed to the Illinois Attorney General upon filing.

<u>**THIRD CLAIM FOR RELIEF**</u>
**Unjust Enrichment**
**By Plaintiff Against All Defendants Individually and On Behalf of the Multistate Class**

198. Plaintiff repeats the allegations contained in paragraph 1-170 above as if fully set forth herein.

199. Plaintiff brings this claim individually and on behalf of the members of the Multistate Class against Defendants.

200. Plaintiff and the other members of the Class conferred benefits on Defendants by purchasing the purported attorney services.

201. Defendants have been unjustly enriched by retaining the revenues derived from Plaintiff and the other members of the Class purchase of the purported attorney services. Retention of the monies under these circumstances is unjust and inequitable because Defendants' purported services were misleading to consumers, which caused injuries to Plaintiff and the other members of the Class because they would not have purchased the services if the true facts were known.

202. Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the other members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the other members of the Class for their unjust enrichment, as ordered by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the other Class members respectfully request that the Court:

A. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Award damages, including compensatory, exemplary, statutory, incidental, consequential, actual, and punitive damages to Plaintiff and the Classes in an amount to be determined at trial;

C. Award Plaintiff and the Class their expenses and costs of the suit, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

D.      Grant restitution to Plaintiff and the Class and require Defendants to disgorge their ill-gotten gains;

E.      A declaration that all contracts between Plaintiff and the Class (or, in the alternative, the Illinois Subclass) are null and void; and

F.      Grant any and all such other relief as the Court deems appropriate.

Dated: August 12, 2022            Respectfully submitted,

By:    */s/ Carl V. Malmstrom*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
Carl V. Malmstrom
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Facsimile: (212) 545-4653
malmstrom@whafh.com

Scott Priz
**PRIZ LAW LLC**
3230 S. Harlem Ave., Suite 221B
Riverside, IL 60546
Telephone: (708) 762-3143
priz@priz-law.com