UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIA BRIGGS, Individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | No. 1:22-CV-03705 |
| v. | ) ) | |
| STRATEGIC FINANCIAL SOLUTIONS, LLC, VERSARA LENDING, LLC, and JOHN DOES 1–100, | ) ) ) ) ) | Judge Edmond E. Chang |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Julia Briggs brought a proposed class action against Defendants Strategic Financial Solutions, LLC, Versara Lending, LLC, and unknown individuals, alleging common law fraud, fraud in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and unjust enrichment.[1] R. 5, First Am. Compl.[2] Strategic Financial Solutions (which the defense says is actually StratFS LLC, and to which its CEO refers as "SFS," R. 18-1 ¶ 1) and Versara move to stay the case and compel arbitration, or in the alternative, to dismiss the case for failure to adequately state a

---

[1]The Court has subject-matter jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). Julia Briggs is a citizen of Illinois. First Am. Compl. ¶ 20. Defendant SFS LLC's sole member is Strategic Family, Inc., which is a Delaware corporation with its principal place of business in New York. R. 43, Jurisdictional Statement & Status Report ¶ 1. Defendant Versara Lending, LLC is a wholly owned subsidiary of SFS, and SFS LLC is Versara's sole member. First Am. Compl. ¶ 23. There thus is minimal diversity between the parties. The amount in controversy exceeds $5,000,000 when considering claims of proposed class members, and none of the exceptions to CAFA jurisdiction apply.

[2]Citations to the record are noted as "R." followed by the docket entry number and, if needed, a page or paragraph number.

claim. R. 18, SFS Mot.; R. 19, Versara Mot. SFS also moves to dismiss for lack of personal jurisdiction. SFS Mot. For the reasons discussed below, the Court denies the Defendants' motions.

### I. Background

In deciding a motion to dismiss, the Court accepts well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 663–64 (2009). In this case, Briggs alleges that SFS is at the center of a fraudulent scheme to bill clients for services as a debt-relief consultant for more than is permissible under state debt-relief statutes. First Am. Compl. ¶ 1. According to Briggs, SFS creates fictional entities to solicit individuals with high consumer debt. *Id.* ¶ 2. These individuals are then directed to law firms, which are fronts for individual attorneys recruited by SFS to act as intermediaries with clients—but without knowledge of SFS's role and without the law firms or SFS telling the clients about SFS. *Id.* ¶ 5. At SFS's direction, these attorneys set up law firms, enter into retainer agreements with clients, and bill clients for upfront and monthly fees, using a notary whom SFS pays for and an SFS payment processor. *Id.* SFS takes a majority portion of the fees charged by the law firms; the firms receive only around 3% to 10% of the fees. *Id.* ¶¶ 5, 12. These fees far exceed the amount that non-attorneys are allowed to charge for debt-relief services under state statutes, which limit non-attorney fees to contingency payments based on the amount of debt reduction. *Id.* ¶¶ 3, 4. The attorneys do not personally contact creditors; instead, only SFS employees conduct any debt negotiations on behalf of clients. *Id.* ¶ 11. The attorneys' sole role is to set up the

retainer agreement and payment, and sometimes (although it seems rarely, and in Briggs's case never) appear in court when creditors sue clients. *Id.* ¶¶ 12, 52, 53. All of the communications that clients attempt to have with their attorneys are actually redirected to SFS call centers, again without disclosure to the clients. *Id.* ¶ 2, 14. Versara is an SFS subsidiary that allegedly participates in this scheme. *Id.* ¶ 23.

As further discussed below, Briggs is an alleged victim of this fraudulent scheme, and was charged thousands of dollars by Monarch Legal Group, an SFS-affiliated law firm. *Id.* ¶ 21, 38, 45. Only one of her debts was ever settled, and it was SFS (not Monarch), unbeknownst to Briggs, that negotiated her debt on her behalf; indeed, Monarch never appeared in a creditor lawsuit brought against her. *Id.* ¶¶ 49, 52, 53. Briggs did not know about SFS and Versara's involvement.

## II. Standard of Review

### A. Personal Jurisdiction

The plaintiff bears the burden of establishing that personal jurisdiction is proper when jurisdiction is challenged by a defendant. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). For personal-jurisdiction challenges, the operative rule is Federal Rule of Civil Procedure 12(b)(2). If material facts are disputed, then the Court must consider the need for discovery and perhaps an evidentiary hearing to resolve the disputes. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Where, as here, the court rules on the motion to dismiss without an evidentiary hearing, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Purdue Rsch. Found.*, 338 F.3d at 782 (cleaned up); *Hyatt Int'l*

*Corp.*, 302 F.3d at 713. If a defendant submits affidavits or other evidence in opposition to jurisdiction, the plaintiff must "submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Rsch. Found.*, 338 F.3d at 783. Still, "the plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor." *Id.*

### B. Motion to Dismiss for Failure to State a Claim

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere conclusions. *Iqbal*, 556 U.S. at 678–79.

In the ordinary course under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But claims alleging fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state

4

*with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). And Rule 9(b)'s heightened standard applies to fraud claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act if the claim is premised on fraud. *Pirelli v. Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). Thus, Rule 9(b) requires a complaint, very generally speaking, to "state the identity of the person making the misrepresentation … and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (cleaned up).[3] Put differently, generally, a complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (cleaned up). Still, context—that is, the overall factual setting of a claim—is important in evaluating what level of detail is required under Rule 9(b). *Id.* at 442.

### III. Analysis

### A. Personal Jurisdiction

Under the Federal Rules of Civil Procedure, federal courts generally may exercise personal jurisdiction over a defendant if the defendant is subject to a state court's jurisdiction of the state in which the district court sits. Fed. R. Civ. P. 4(k)(1)(A). In Illinois, that means that this Court "may exercise personal jurisdiction over [the Defendants] if it would be permitted to do so under the Illinois long-arm statute." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). "Because

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Illinois permits personal jurisdiction if it would be authorized by either the Illinois Constitution or the United States Constitution, the state statutory and federal constitutional requirements merge." *Id.* Under the federal Constitution, personal jurisdiction requires a defendant to have made "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (cleaned up).

Personal jurisdiction can be either general or specific. The Court may exercise general jurisdiction if the defendant's contacts with the forum state are "so continuous and systematic as to render them essentially at home" there, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cleaned up), even if the lawsuit has no relationship to the defendant's contacts to that state. In contrast, specific jurisdiction only allows courts to hear lawsuits where the defendant's contacts with the forum state give rise to the plaintiff's claims. *See Curry v. Revolution Laboratories, LLC*, 949 F.3d 385, 395 (7th Cir. 2020).

SFS challenges whether it is subject to personal jurisdiction, either general or specific. The company offers a declaration from its CEO, Ryan Sasson, averring that SFS is a Delaware limited liability company that is not registered in Illinois, and has no office, business operations, bank accounts, or employees in Illinois, and does not sell products in Illinois. R. 18-1, SFS Mot., Sasson Decl. ¶¶ 2, 3. According to Sasson, SFS is a holding company that holds stock and interests of subsidiary companies, none of which themselves are Illinois entities. *Id.* ¶¶ 2, 4. One of SFS's subsidiaries

6

is Monarch Client Services, LLC (Monarch CS), which "provides non-legal and administrative support services to Monarch Legal Group." *Id.* ¶¶ 5, 6. Sasson contends that SFS "does not provide services to Monarch or its clients, has no control or involvement in the services that Monarch CS provides to Monarch or Monarch's clients, and is not a party to any contract between or among Monarch CS, Monarch, and/or Timothy Burnette." *Id.* ¶ 7. On this basis, SFS argues that it does not have "minimum contacts" with Illinois. SFS Mot. at 7–8.

In response, Briggs cites her client activity log from Monarch—provided to Briggs through a subpoena issued in this litigation—which includes the activity of numerous users with "SFS" in their usernames. R. 27, Pl.'s Resp. at 8–10; R. 27-4, Pl.'s Resp., Exh. 4. The log reflects that Michael Cohen (whose emails are micohen@financesolutions.org and micohen@strategicconsulting.com) was informed of attorney contact with Briggs; Michael Cohen spoke to Briggs; and users including "anand_exela_sfs," "sgatti_sfs," and "lmontanile_sfs" took various actions, such as referring Briggs's debt to litigation defense, transferring Brigg's file, and downloading Briggs's file. Pl's. Resp., Exh. 4. Briggs also provides screenshots of LinkedIn user profiles for Stephanie Gatti and Lauren Smaldon (formerly Montanile), who list SFS as their employer and whose names correspond to the usernames in Briggs's client activity log. R. 27-7, Pl.'s Resp., Exh. 7; R. 27-8, Pl.'s Resp., Exh. 8. Finally, Briggs provides the LinkedIn job descriptions of other SFS employees, who describe their roles as debt negotiator and state that they work for affiliate firms, including Monarch. R. 5-2, First Am. Compl., Exh. B; R. 27-9, Pl.'s Resp., Exh. 9; R. 27-10, Pl.'s Resp., Exh. 10.

SFS does not challenge the factual allegations reflected in the client activity log or in the LinkedIn profiles, instead arguing that Briggs has provided "unauthenticated materials" instead of "actual evidence," in contrast to the Sasson declaration. R. 31, SFS Reply at 4.

SFS's argument overstates Briggs's burden of proof. Briggs has met her burden of establishing specific jurisdiction over SFS. Although affidavits from Briggs might have helped, Briggs has provided sufficient evidence in the form of her client activity log and the LinkedIn user profiles to show that SFS employees were involved in Monarch's legal representation of her, which took place in Illinois. If the parties' evidence conflicts, then the Court must resolve those conflicts in Briggs's favor when evaluating whether she has made a *prima facie* showing in support of personal jurisdiction. *Purdue Rsch. Found.*, 338 F.3d at 782–83. And it is telling—the silence speaks volumes—that SFS does not actually challenge any of Briggs's assertions that the client activity log shows that SFS employees worked on her case. The screenshots of LinkedIn profiles provide publicly available information from SFS employees describing their job responsibilities and connecting usernames to SFS employee profiles. SFS does not specifically contest the statements in the LinkedIn profiles. SFS does not, for example, provide a record showing that, after a diligent search of personnel records, no one with the names identified by Briggs has ever worked at SFS, or provide contradicting job descriptions for the SFS employees. Briggs has thus satisfied her burden by providing evidence that SFS has sufficient minimum contacts with Monarch's representation of her in Illinois, and these contacts give rise to Briggs's claims

against SFS in this case. This Court has specific personal jurisdiction over SFS. If, as discovery progresses, the facts show otherwise, then SFS may renew its challenge to personal jurisdiction.

### B. Motion to Stay and Compel Arbitration

SFS and Versara contend that this case must be stayed and be sent to arbitration pursuant to Briggs's retainer agreement with Monarch. Versara Mot. at 7–11; SFS Mot. at 8–9. SFS and Versara are not parties to the retainer agreement, but they argue that because of the delegation clause in the retainer, even the threshold question of whether the arbitration agreement applies to them is for an arbitrator and not the Court. *Id.*[4]

The parties talk past each other on this dispute, oddly adopting the opposing side's arguments on the merits for their positions on arbitration. SFS and Versara argue on the merits that they are entirely separate entities from Monarch and the wrong parties to the suit. *See* SFS Reply at 6 ("Briggs has sued the wrong parties in this case."). Yet for the purposes of arbitration, they argue that they are effectively the same party as Monarch, and Monarch's arbitration agreement should be enforced on their behalf against Briggs. *See* Versara Mot. at 10–11 ("Briggs has alleged that Monarch, SFS, and Versara are all one and the same, there is no meaningful distinction between Versara and the others, and they collectively induced her into retaining

---

[4]The retainer agreement's arbitration clause states that "[a]ny controversy, claim or dispute between Client, on the one hand, and Monarch, any of its attorneys, and/or any of its third-party service providers, on the other hand, arising out of or relating to this agreement or the breach, termination, enforcement, performance, interpretation or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration." R. 19-1, Versara Mot., Burnette Decl., Exh. A at 15.

Monarch. Thus, an arbitrator must decide whether the claims against Versara are within the scope of the arbitration agreement." (cleaned up)). Briggs, for her part, maintains—on the merits—that Monarch was merely a front for SFS and Versara, but argues—for arbitration-enforcement purposes—that because "Versara contends that neither Defendant has any relationship," the defendants may not enforce the arbitration agreement against her. Pl.'s Resp. at 2.

Under the Federal Arbitration Act, "parties to a contract" may "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions," such as "whether [an] arbitration agreement applies to the particular dispute." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). A contract term that delegates arbitrability questions to an arbitrator is sometimes referred to as a "delegation clause." The Supreme Court has held that before sending a dispute to arbitration pursuant to a delegation clause, the federal court must determine first "whether a valid arbitration agreement exists." *Id.* at 530. SFS and Versara are not signatories to Briggs's arbitration agreement with Monarch, but they argue (citing *Henry Schein, Inc.*) that whether the arbitration agreement applies to them should be decided by an arbitrator.

Although case law on this issue has been described as "muddled," *Al-Nahhas v. Rosebud Lending LZO*, 2023 WL 5509320, at *8 (N.D. Ill. Aug. 25, 2023) (cleaned up), and "inconsisten[t]," *O'Connor v. Ford Motor Co.*, 2023 WL 130522, at *5 (N.D. Ill. Jan. 9, 2023), courts in this district generally agree that "a non-signatory's standing to enforce an arbitration agreement is an issue for courts, rather than an

10

arbitrator, to decide" even when a contract includes a delegation clause. *Al-Nahhas,* 2023 WL 5509320, at *8; *see CCC Intelligent Sols. Inc. v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022) (holding that it is for the court, and not an arbitrator, to decide whether "the parties have agreed to arbitrate"). The question is for courts to decide because it is an issue of contract formation. *O'Connor*, 2023 WL 130522, at *6 (citing *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837–38 (7th Cir. 2022)). So the Defendants are wrong in arguing that the Court's first step evaluation is limited to whether a valid contract exists at all, and not whether a valid contract was formed between the *parties* seeking to enforce the contract. Versara Mot. at 6–7; SFS Mot. at 8; R. 30, Versara Reply at 3–6; SFS Reply at 4–5.[5]

In considering whether to enforce the arbitration terms of a contract against non-signatories, state law applies. *Sosa v. Onfido*, 8 F.4th 631, 637 (7th Cir. 2021). In Illinois, a "nonsignatory to a contract typically has no right to invoke an arbitration provision contained in that contract." *Id.* at 639 (citing *Caligiuri v. First Colony Life Ins. Co.*, 742 N.E.2d 750, 755 (Ill. App. Ct. 2000)). Having said that, there are at least three exceptions that would permit non-signatories to enforce arbitration provisions: third-party beneficiary, agency, and equitable estoppel. *Id.* Although Briggs

---

[5]Versara cites many decisions from other circuits and districts holding otherwise. Versara Mot. at 10 n.3. But as discussed above, persuasive cases in this district explain that the question of whether an arbitration agreement applies to non-signatories is a question for the court to decide even if an arbitration agreement includes a delegation clause, because the issue is really one of contract *formation*. In the only relevant decision from this district cited by the Defendants, the court *did* consider whether to enforce an arbitration agreement with a delegation clause against a non-signatory instead of compelling arbitration on that question, because the non-signatory did not respond to the argument that the court, and not an arbitrator, should decide in the case of non-signatories enforcing a delegation clause. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 526–27 (N.D. Ill. 2019); Versara Mot. at 9.

11

anticipates these possible arguments, Pl.'s Resp. at 2–5, neither SFS nor Versara argue that any of the exceptions apply to them. The Defendants only assert that the delegation clause prevents the Court from considering their right to enforce the contract at all. Versara Mot. at 6–7; SFS Mot. at 8; Versara Reply at 5 n.4 ("Versara did not address the various third-party enforcement doctrines in its motion to compel arbitration precisely because those arguments are not for the Court to decide."); SFS Reply at 4–5. Thus, the Defendants provide no reason for the Court to enforce the contract—including the mandatory arbitration clause—against Briggs. In absence of any argument from the Defendants about their rights to enforce a contract as non-signatories under Illinois state law, their motion to stay this case and compel arbitration is denied.

### C. Adequacy of the Claims

### 1. Common Law Fraud

To adequately state a common law fraud claim, Briggs must allege, with particularity, "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (quoting *Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 591 (Ill. 1996)). In their motions to dismiss, SFS and Versara contend that Briggs has not adequately identified specific fraudulent statements that the Defendants made and that Briggs relied on. Versara argues that

Briggs's allegations amount to "exactly one conversation with someone who 'on information and belief,' worked for Versara." Versara Mot. at 12 (cleaned up). SFS for its part denies that Briggs makes any allegations that SFS made "any statements or representations" to Briggs at all. SFS Mot. at 10.

In her amended complaint, Briggs adequately identifies false representations made by SFS and Versara with the intent to induce Briggs to act, and which Briggs did in fact allegedly rely on to her detriment. Briggs alleges that SFS sent mailers to people with high consumer debt from fictitious entities created by SFS to induce people in debt to pay fictitious law firms for their help settling debts. First Am. Compl. ¶¶ 69, 71–75. Briggs received a mailer from Polo Funding, one such entity allegedly created by SFS, that offered a debt consolidation loan for consumer debt. *Id.* ¶¶ 36, 71–72. Briggs alleges that she called the phone number listed from Polo Funding and spoke with someone who claimed to work for Monarch, but who "on information and belief" was a Versara employee. *Id.* ¶ 37. After this conversation, Briggs received a retainer agreement from a Monarch email address. *Id.* ¶ 38. Briggs alleges that SFS drafted the retainer agreement. *Id.* Versara allegedly scheduled a notary appointment for Briggs to sign the retainer, and SFS allegedly hired and dispatched the notary public. *Id.* ¶ 39. Briggs filled out a form provided by the notary that set up a payment plan for Briggs to pay Monarch, but Monarch then used an SFS payment processor called RAM Payment. *Id.* ¶ 40. Briggs paid $8,847.98 to Monarch, minus $3,666.78 that was refunded as "settlement reserves," even though only one debt was settled with JC Penney (reduced to $302 from $544), and SFS negotiated the debt. *Id.*

13

¶¶ 45, 49. Briggs alleges that SFS, and not Monarch, corresponded with debt collectors on Briggs's behalf, and Monarch did not provide any information about correspondence with debt collectors to Briggs. *Id.* ¶ 49. Briggs alleges that she was sued by Citibank for $12,518.56, Monarch knew about the lawsuit, and no attorney appeared on her behalf. *Id.* ¶¶ 52, 53. Briggs attempted to call Monarch "numerous times" without response. *Id.* ¶ 51. According to Briggs, if non-attorneys had billed Briggs for the debt-reduction services that she received, they would have been permitted to charge only $86.23 (for settling the JC Penney debt). *Id.* ¶ 55.

The Defendants object to Briggs's use of "information and belief" in the complaint when making allegations about SFS and Versara's statements to her. SFS Mot. at 10–11; Versara Mot. at 12–13. It is true that this qualification subjects Briggs's claims to further scrutiny when alleging fraud, but it is still "permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for [her] suspicions." *Pirelli*, 631 F.3d at 443 (cleaned up). Considering the factual context of the alleged fraud, the entire purpose of SFS and Versara's fraud was to conceal their role in the scheme, meaning that if anyone from SFS or Versara did communicate with Briggs, they would not have revealed their identity in those conversations, making those facts inaccessible to Briggs.

Moreover, in addition to her own experience, Briggs describes SFS's and Versara's broader pattern of fraudulent behavior that is consistent with her personal experience, citing information from a confidential informant and the findings of a North Carolina state bar attorney disciplinary proceeding. Specifically, Briggs alleges

14

that the confidential informant described the following: SFS has a rotating set of websites of fictional entities to solicit customers without triggering an alert from fraud-warning websites, First Am. Compl. ¶ 75; SFS call center employees respond to calls and online queries to these fictional entities identifying themselves as Versara employees, *id.* ¶ 76; SFS directs call center workers to steer clients towards attorney services for regular monthly billing rather than limited contingency-fee billing, *id.* ¶¶ 77, 79, 82; SFS pays for and dispatches a notary for the client to sign an SFS drafted retainer agreement once a client agrees to attorney representation, *id.* ¶¶ 84, 85; withdrawals from client bank accounts are distributed to SFS, even though clients are unaware of SFS's existence and involvement, *id.* ¶¶ 85, 90, 91, 92; and except for an introductory phone call with an attorney, all other client communication is handled by SFS call center employees who do not reveal their identity, leading clients to believe they are speaking with representatives from the law firm. *Id.* ¶¶ 95, 96, 97. These allegations are consistent with the findings of the Disciplinary Commission of the North Carolina State Bar, arising from a proceeding against an attorney for setting up an SFS-affiliated law firm, leaving SFS to conduct any debt negotiations and respond to client questions without disclosing SFS's role, and charging clients more than permissible under North Carolina law for non-attorney debt relief services. *Id.* ¶¶ 119–43. At the dismissal-motion stage, this circumstantial evidence, together with Briggs's allegations about her own experience, provide sufficient grounds for her suspicions and defeat any concerns about pleading "on information and belief." *See Pirelli*, 631 F.3d at 443.

Drawing all reasonable inferences in Briggs's favor, Briggs has identified with sufficient particularity instances in which SFS and Versara made false statements, concealing their identity and inducing Briggs to believe that she had hired a law firm that would reduce her debts, when in fact the employees of two other companies that she was not aware of (and who were not lawyers) managed (or indeed, failed to manage) all aspects of her case. The scheme that Briggs identifies would not work unless everyone that communicated with her knew that they were making false statements about who was involved. This is confirmed by a Glassdoor review, cited in the complaint, from a former SFS employee: "It's pretty much a scam. … Answer the phone as any of 10 different law firms and fake it till you make it through the conversation." First Am. Compl. ¶ 98. Briggs has sufficiently alleged that the communications from the mailer, phone calls, notary meeting, and retainer agreement all amounted to false statements from SFS and Versara, albeit concealed by other actors.

These factual allegations on their own are enough to conclude that even under the Civil Rule 9(b) heightened-pleading standard, when considering the allegations in the light most favorable to the plaintiff, Briggs has adequately pleaded the fraud claim. Going even further, in responding to the motions to dismiss, Briggs provides many more facts connecting SFS to her client activity log from Monarch (as discussed earlier in this Opinion in connection with personal jurisdiction). "[F]acts alleged by a plaintiff in a brief in opposition to a motion to dismiss may be considered when evaluating the sufficiency of a complaint so long as they are consistent [with] the allegations in the complaint." *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015). The client

16

activity log further suggests that SFS employees worked on Briggs's debt case despite Briggs's belief that she had hired Monarch, a law firm, to assist her with her debts. Pl.'s Resp., Exh. 4. These facts are consistent with those alleged in the amended complaint and erase any doubt that Briggs has adequately pleaded her claim. There is thus no practical reason to require a second amended complaint at this stage.

### 2. Fraud Act

SFS and Versara move to dismiss the claim under the Illinois Consumer Fraud and Deceptive Business Practices Act for the same reasons as the common law fraud claim: Briggs purportedly has not identified fraudulent statements made by the Defendants and the allegations are made on information and belief. Versara Mot. at 13–14; SFS Mot. at 11–12. In the absence of arguments specific to the statutory fraud claim—the Defendants offer none—the challenge to the Fraud Act claim is rejected for the same reasons that the challenge to the common law fraud claim fails.

### 3. Unjust Enrichment

Lastly, SFS and Versara move to dismiss the unjust enrichment claim, arguing only that the claim is not really a separate cause of action from the fraud claims and thus the unjust enrichment claim must be dismissed if the fraud claims are. Versara Mot. at 14–15; SFS Mot. at 12–13. But this sole argument hinges on dismissal of the fraud claims, which have survived the dismissal motion. So the unjust enrichment claim also remains intact.

## IV. Conclusion

The motions to stay the case and to compel arbitration are denied. The motions to dismiss the complaint for failure to state claims and for lack of personal jurisdiction are also denied. As previously discussed, given the Receivership imposed in *CFPB et al. v. Stratfs, LLC et al.*, 24-cv-40 (W.D.N.Y.), the parties (the Receiver's attorney has now filed an appearance) shall confer and file Position Statements setting forth their proposed next steps (if any, for now) of the litigation. The conferral shall conclude no later than April 8, 2024, and the Position Statements shall be filed not later than April 15, 2024.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 27, 2024